## LABURNUM CONSTRUCTION CORPORATION

v.

### The UNITED STATES.

No. 530-59.

United States Court of Claims.
Dec. 13, 1963.

452

Jay M. Weinberg, Richmond, Va., for plaintiff. Alan G. Fleischer and Hirschler & Fleischer, Richmond, Va., were on the briefs.

John R. Franklin, Washington, D. C., with whom was John W. Douglas, Asst. Atty. Gen., for defendant. Edna P. Goldberg, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

WHITAKER, Judge:

This is an action for breach of a contract for the installation of approximately 10,000 feet of high pressure steam line at the United States Naval Base in Norfolk, Virginia. The specifications called for the construction of a 16-inch pipeline above the ground connecting an existing steam line outside the Base with a steam plant at the South Annex area within the Base. The pipe was to be supported by concrete pedestals which in turn would rest upon wooden piles driven into the ground except for a few short underground stretches where the line connected with existing steam lines or went beneath roads.

Plaintiff, the low bidder,[1] was awarded the contract on April 19, 1957, and was authorized to proceed on April 24. By the terms of the contract, the work was to be completed on February 18, 1958, 300 days after it was started. Actually, however, the work was not completed until October 20, 1958, 544 days from the authorized starting date and, since the work had not been inspected and a few odd jobs remained to be done, plaintiff did not completely quit the site until November 12, 1958.

Plaintiff alleges that defendant's unreasonable delays, resulting from errors in the specifications and tardiness in correcting those errors, constitute a breach of the contract. Plaintiff says that, but for these delays, it could have completed the work, as set forth in the specifications on which it bid, in 210 days. It claims damages for its costs and loss of profits incurred during the excess of 334 days over 210 days, with a deduction of 56 days of delay which it admits were not the fault of defendant. In the alternative, plaintiff claims that the changes made by defendant were so extensive as to constitute a fundamental alteration of the scope of the contract and, hence, a breach of it.

The Trial Commissioner to whom the case was referred concluded that plaintiff's prognosis of a 210-day work schedule was unrealistically optimistic, and that it could not have reasonably expected to complete the work in less than 300 days. He calculated the period of delay from the completion date specified in the contract and found that plaintiff's work had been delayed during the construction period from February 18, 1958 to October 20, 1958. The Commissioner concluded that one-half of this eight-month period was consumed by circumstances beyond the control of either party, and that the remaining four months of delay were caused by the defendant and were unreasonable in the circumstances. He further found that plaintiff had prosecuted the work as diligently as possible, and that none of the delay was chargeable to it.[2] The Trial Commissioner calculated plaintiff's damages by computing its net loss on the entire contract (direct costs minus the price paid) and allowed plaintiff one-half of this amount.

Neither party is satisfied with the result reached by the Commissioner. Plaintiff contends that the period of delay should be calculated from November 30, 1957, 210 days after it began work, and that defendant is liable for more than 80% of the delay during the remaining time it was on the job. Defendant says that any delay it caused was reasonable and that, in any event, recovery should be limited to costs that were incurred during the last few weeks of performance, when plaintiff had only a few men and virtually no equipment at the site. In addition, both parties quarrel with the method used to compute the damages.

■ We have concluded that the Trial Commissioner was right in finding that the defendant caused unreasonable delay. However, we think the delay was somewhat longer than four months, as found by the Commissioner, and we cannot agree with the Commissioner's method of computing the damages.

At the outset of the work the plaintiff had hired a firm of surveyors and engineers to stake out the route the steam line would take and to compute the alignment and grade of the pedestals that were to support the pipe in accordance with the specifications. But as soon as the surveyors began work it became evident that errors abounded in defendant's specifications.

Near the eastern terminus, where the line was to join an existing steam line, the surveyors discovered that, in order to follow the routing set out in defendant's plans, 84 feet of pipe in addition to the quantity called for in the specifica-

1. Plaintiff's bid was $445,000. The next highest bid was $448,000, and the high bid was $464,497.

2. Plaintiff now admits that it is responsible for a ten-day delay in starting work.

tions would be needed. It required a week of conferences between plaintiff's surveyor, plaintiff's foreman and defendant's representatives before defendant authorized inclusion of the missing footage and consequent respacing of the pedestals. During that time, defendant directed the surveyors to abandon that part of the line and to proceed to another area.

At another point, the drawings called for the pipeline to skirt a trash dump and to run between the dump and a tidal basin. The plaintiff found, upon surveying this route, that the area between the dump and the basin was a swamp in which the piles could not be sunk. On June 3, 1957, having been advised of this difficulty, the defendant's inspector told the surveyors to do no more work in this area pending a relocation of the line. It was not until July 8, 1957 that plaintiff was told to move the line away from the water and out of the swamp. That decision ran the line through a large pile of trash and debris in the dump. The plaintiff could not drive piling until this obstruction was removed, and it was defendant's obligation to remove it.[3] Removal of the trash and debris from the route should not, according to the evidence, have taken more than a few hours. Yet defendant did not remove a sufficient quantity to permit plaintiff to lay the line until September 10, 1957.

The two instances mentioned in the above paragraphs seriously delayed the entire project, for the reasons explained below.

When plaintiff's surveyors came to the western terminus of the line in the South Annex area, they discovered numerous errors in the specifications. The specifications placed the line over an existing concrete road, and it appeared that the supports, if installed as specified, would have protruded from the steps of a building. Also in this area, the plans led the line under a high tension wire (where the line could not be installed) and directly across an access road. After these mistakes were discovered, defendant decided to re-design the entire South Annex area. The surveyors pointed out these errors on May 21, 1957. Defendant produced a sketch of the new design on June 11, 1957 and requested plaintiff to supply cost estimates on the proposed changes. Although plaintiff gave its estimate of the cost to make the changes on July 5, defendant did not authorize plaintiff to proceed with the surveying of the new location until October 8, 1957, four and one-half months after the defects were first brought to defendant's attention.

These defects in the plans also seriously delayed the entire project. Defendant says that since plaintiff was working from the eastern end of the line towards the western terminus, where the South Annex was located, the work there was to be done last anyway, and, hence, plaintiff was not delayed by the re-design of the South Annex. This contention ignores the fact that the work was planned to be done in stages and that each stage was to run the entire length of the line. First, plaintiff was to do the surveying, then the piledriving, then the construction of the pedestals, next the installation of the steel pipe, and finally the insulation and finishing work. As each stage was completed, plaintiff could release the subcontractor responsible for that stage and remove the skilled workmen particularly concerned with it from the payroll. When defendant prevented plaintiff from doing any work at all on a certain segment of the line, therefore, it completely dislocated plaintiff's work schedule and increased the time and expense of completing the job.

As a result of the changes necessary to correct errors in the plans, the sur-

---

**3.** Section 2 of the specifications provided, in part:
  "2.2 *Elevations and obstructions.* Bids shall be based on the following:

\* \* \* \* \*

  "2.2.2 that no pipes or other artificial obstructions, except those noted or indicated, will be encountered."

veyors did not complete their work until October 14, 1957, more than four months after they had started. They could not work throughout this period, but had to wait to see where defendant would place the route; out of the four months they were on the job, they spent only 22 days in the field, some of which were consumed laying out a portion of the line that they had previously gone over, where defendant had altered the route. Meanwhile, plaintiff was able to accomplish some work that did not involve laying the line above ground. The underground stretches, at points where the line went under roadways and connected with the existing steam line, were finished first. As a result, not all of the time during which the surveyors awaited design changes was lost. After a while, though, only the overland portion of the line remained to be done, and this necessarily awaited the work of the surveyors.

The spacing of the uprights was a critical matter that could not be fully resolved until the survey and staking out was completed. The plans specified that they be located at intervals of 35 feet. When one segment of the line was moved, therefore, the result was a respacing of the pedestals all along the line. Since the surveyors had to mark the locations where the posts were to be situated, relocation of the line compelled them to redo any staking previously accomplished in the vicinity of the change. Virtually all productive work had to be suspended, after the underground work was done, until the surveyors had finished. During this time, defendant insisted, on pain of invoking the liquidated damages provision,[4] that plaintiff and its work force remain on the site awaiting completion of the survey.

The final major cause of delay was the faulty design of the supports for a double action expansion joint in the pipeline. The purpose of this mechanism was to take up expansion of the pipe when hot steam at high pressure was driven through it. Although the joint was installed on January 10, 1958, it was first tested on March 4. At that test, the uprights which supported it gave way slightly, because of inherent design deficiency, causing the joint to "bind". The joint would not operate properly unless the uprights remained rigidly perpendicular·when the steam was turned on. As a result of the test, two of the uprights were cracked by the failure of the joint to take up the line's expansion pressure, and had to be replaced. After this malfunction, the joint was removed for inspection. The inspection failed to show any defects in it, and defendant ordered it replaced. Defendant did not get around to testing it again with high pressure steam until July 23, 1958, when it failed again. At defendant's orders, the joint was removed and returned to the manufacturer, who was unable to find any fault with it. In September it was re-installed, but again failed to work.

All during this time, plaintiff insisted that the difficulty lay not with the joint that it had supplied, but with defendant's design for its installation. On one occasion, plaintiff welded rigid steel support bars between the uprights to prevent them from bending out of the perpendicular. The joint operated satisfactorily with the supports thus held rigid. But this was only a temporary expedient as both parties recognized: the line could not be left in this fashion, for the support bars would eventually give way. Defendant was loathe to resort to an expansion loop in lieu of the joint at this point because the loop would take up space upon which defendant planned to erect a building.

On September 26, 1958, over six and one-half months after the joint first

---

4. Sections 1.6 and 1.7 of the specifications made the contractor liable for liquidated damages of $175 per day for each day in excess of 300 that it took to complete the work. Defendant's retroactive extension of the completion date eventually waived any liability under this clause.

failed to work, defendant requested a cost estimate on replacing it with an expansion loop. Plaintiff submitted the estimate six days later and was told to proceed with the change on October 8.

Plaintiff alleged that there were numerous other government-caused delays. The Trial Commissioner found that some of these delays were not chargeable to the Government, some were not unreasonable and that others were *de minimis*. For instance, plaintiff pointed to its delay in the receipt of steel. It was offered the steel pipe it needed by the wholesaler during the Spring of 1957, but refused delivery because the job was not ready for the installation of pipe, and it would have been inconvenient to stockpile it at the site at that time, and then have to transport it to the point of use at a later date. When the need for pipe subsequently arose, plaintiff had difficulty in obtaining a sufficient quantity from the mill, and it did not all arrive until November, two months after the job was ready for it. The Trial Commissioner felt that in the circumstances, the Government should not be charged with this delay. Responsibility therefor is not free from doubt, but it occurred, in part at least, during the period of delay for which we find the defendant is responsible for other reasons, as hereafter set out, and, by and large, we think the Commissioner's conclusion was correct. A short delay occurred when plaintiff, in constructing a manhole, discovered that the plans placed the top of the manhole below the level of the ground, and that the manhole would be buried when the project was finished. The proper height was attained, however, simply by pouring an added foot of concrete into the wall of the manhole; no changes in the equipment installed therein were necessary. The Commissioner treated this error in the plans as too minor to be a legitimate source of complaint.

An example of Government-caused delay that the Commissioner found was tolerable in its duration was the difficulty encountered in passing the steam line under a railroad trestle. The contractor had planned to cut into the trestle to support the line—it assumed that the plans permitted this—but the railroad company refused to permit the trestle to be cut. Fortunately, the defendant had someone on the scene with the ability and authority to solve the problem, and the line was supported in a different fashion. We concur with the Commissioner and adopt his conclusions with respect to these and the other instances of what plaintiff claims were unreasonable Government-caused delay.

Defendant issued three formal change orders on the contract. The first was dated February 24, 1958; it decreased the contract price by $800 and covered, *inter alia*, the omitted 84 feet of pipe and the changes at the South Annex. Another change order, issued May 13, 1958, increased the price by $6,795. The third order was issued on December 4, 1958, after the contract had been performed; it increased the price by $6,955 and covered the replacement of the expansion joint with an expansion loop. In addition, plaintiff was granted extensions of time sufficient to cover the time required to complete the work. The net effect of the change orders was to increase the contract price to $457,950. Plaintiff has received this sum from defendant.

On May 12, 1958, plaintiff advised defendant's Officer in Charge of Construction that it was claiming an additional sum sufficient to give it a 5% "profit and overhead fee" over and above its increased costs on the entire contract. Defendant's reply denied liability for any damages. On January 15, 1959, plaintiff requested a final decision of the Contracting Officer on its claim for additional compensation of approximately $46,000. The claim was denied, and plaintiff appealed to the Armed Services Board of Contract Appeals. On August 10, 1959, the Board, on motion of de-

fendant's counsel, dismissed the appeal for lack of jurisdiction.[5]

On these facts, plaintiff maintains that any Government-caused delay was a breach of contract for which it ought to recover. Defendant says that the changes article [6] permitted it to delay the contractor while it made changes in the specifications, and that, under that clause, plaintiff is entitled to receive only an extension of time and an equitable adjustment of the price to cover the increase in time and costs, plus a reasonable profit incident to the making of the change.

We think the critical factor in this case is that all of the delay to which plaintiff was subjected came about because the specifications were deficient. Were this not the case, defendant's contention would be correct: plaintiff would have no right to complain if the defendant's exercise of its reserved right to make changes set its work schedule awry. See J. A. Ross & Co. v. United States, 115 F.Supp. 187, 126 Ct.Cl. 323 (1953). At least this would be so if defendant had acted with due alacrity. See Anthony P. Miller, Inc. v. United States, 77 F.Supp. 209, 111 Ct.Cl. 252 (1948). In this case, however, plaintiff had contracted to do the work in accordance with the specifications defendant had pre-

pared, and defendant was, therefore, under a duty not to render the project more expensive than it would have been if the contractor could have complied with the plans. In United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), the Supreme Court held that, in a case where the specifications prescribe the character, dimensions and location of the construction work, the Government implicitly warrants that the contractor, if he complies with the specifications, will be able to complete the project within the contemplated period of time. This warranty is akin to the condition implied in every construction contract that neither party will do anything to hinder the performance of the other party. See J. A. Ross & Co. v. United States, supra; George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70 (1947). If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover damages for the defendant's breach of its implied warranty. United States v. Spearin, supra; Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 123 Ct.Cl. 48 (1952). Those damages extend to the costs incurred by reason of the idleness resulting from the mistakes in the plans. The defendant cannot, by errors in the specifications, cause delay in plaintiff's completion of the work

---

5. At oral argument, defendant for the first time asserted that the Armed Services Board of Contract Appeals misconstrued its jurisdiction, and that under the authority of United States v. Carlo Bianchi, Inc., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed. 2d 652 (1963), we must suspend proceedings to permit plaintiff to return to the Board and again urge it to grant a hearing in this case. All else aside, we think defendant's contention is made too late. See Stein Bros. Mfg. Co. v. United States, Ct.Cl. No. 389-59, decided July 12, 1963; WPC Enterprises v. United States, Ct.Cl., 323 F.2d 874, 1963.

6. Clause 3 of the general provisions of the contract provided, in pertinent part, as follows: .
"The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this

contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the Contractor of the notification of change: *Provided, however,* That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any claim asserted at any time prior to the date of final settlement of the contract. * * * But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed."

and then compensate plaintiff merely by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors.

■ Defendant relies on the rule of the Rice,[7] Blair[8] and Foley[9] cases in which the Supreme Court relieved the Government of liability for the cost of the contractor's idleness during periods of delay. In those cases, however, the delay was caused by contractors or other factors outside the Government's control, and the Court so found. This exculpatory rule is not applicable to a situation in which unreasonable delays were the result of defendant's failure to promulgate properly drawn specifications or otherwise the fault of the Government. We have made this distinction before (see, e. g., Kehm Corp. v. United States, 93 F.Supp. 620, 119 Ct.Cl. 454 (1950)), and we adhere to it now.

■■ In this case, it is clear that the delays occurred within two rather well-defined periods: (a) Between May 8, 1957 and October 14, 1957, when errors found by the surveyors had to be rectified and defendant neglected to remove the trash pile that blocked plaintiff's work; (b) In the interval from September 8, 1958, when defendant knew or should have known that its design for the installation of the expansion joint was faulty, to October 8, 1958, when defendant authorized plaintiff to replace the joint with a loop. These two periods total a little more than six months of delay. The Commissioner, having used the 300-day work period provided in the contract as a base for calculation, found that the total delay was eight months. We agree with the Commissioner that the delay should be calculated from the end of 300 days, rather than from the end of the 210-day construction period that plaintiff anticipated. We also agree that the total delay was eight months.

We conclude, however, that of the eight months' total delay, only two months can be ascribed to the fault of the plaintiff and to other factors beyond the control of the defendant.

We think that defendant is liable for the remaining six months of delay. The parties agree that 16 days were lost to inclement weather and that employees of an insulating subcontractor were on strike for 30 days. Plaintiff admits that it is responsible for a delay of ten days in starting work after receipt of notice to proceed. Plaintiff is also chargeable with a portion of the six-day period it took to submit its cost estimates on elimination of the expansion joint. Of the 244 days of delay, therefore, only approximately 60 days were not the result of defendant's erroneous specifications. The balance, 184 days of delay, were caused by these mistakes. We, therefore, conclude that defendant is liable for plaintiff's costs over the six-month period enumerated above.

■ The Commissioner calculated plaintiff's damages by deducting from its overall direct costs the contract price that had been paid to it. He considered the difference (which represents plaintiff's net loss on the project) as the cost of all delay and allowed plaintiff one-half of this sum, or $21,602.72, as the costs incurred during the period of delay for which defendant is liable. The use of this method of computing the damages, however, assumes that plaintiff would have broken even in the absence of any delay. The evidence does not bear out this assumption. In any event, the method used by the Commissioner is fundamentally erroneous in that it denies any profit to the construction contractor merely because the Government has violated its duty not to cause delay by erroneous specifications. Cf. River Construction Corp. v. United States, Ct.

7. United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942).

8. United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039 (1944).

9. United States v. Foley Co., 329 U.S. 64, 67 S.Ct. 154, 90 L.Ed. 1005 (1946).

Cl. No. 13–56, decided November 7, 1962. The proper measure of damages in a case such as this is to permit the plaintiff to recover its costs during the periods of delay. We realize that the periods of delay overlapped to a certain extent, and that, while plaintiff waited for defendant to make up its mind on correcting errors in the plans, it did a certain amount of productive work. Of course, plaintiff cannot recover more than once for a single period of delay, even though it had a number of causes. The amount of productive work accomplished during this period must also be taken into account. Thus, it is not possible, in a case such as this, to calculate exactly the costs allocable to the periods of delay. Plaintiff did not attempt such an allocation of its costs but presented data to show its expenses over the entire performance period.

▇▇▇▇ Plaintiff says that it should be allowed an overall profit of 5% of such costs. In this case, where the work called for by the contract has been completed, plaintiff must take its profit in the contract price. Bostwick-Batterson Co. v. United States, 238 F.2d 956, 151 Ct.Cl. 560 (1960); Torres v. United States, 112 F.Supp. 363, 126 Ct.Cl. 76 (1953); Wyant v. United States, 46 Ct. Cl. 205 (1911). Plaintiff, therefore, should recover only its costs resulting from the complete or partial idleness of its work force during the periods of delay, including an allowance for its indirect costs.[10] The burden of allocating costs to the particular periods involved is upon the plaintiff. If the sum of these costs, plus the contract price, including the equitable adjustments to which the parties have agreed, gives plaintiff a profit on the project as a whole, it should receive the benefit of its bargain. On the other hand, the contractor cannot, because of such delay, be assured of a profit on the whole job by adding a profit to its damages. It has not been deprived of any anticipated profit. It is entitled to recover only its loss incurred on account of the delay. This is a long established rule. The allowance of so-called profit on the costs incurred during the delay would violate the statutory prohibition against cost-plus-percentage-of-cost procurement (10 U.S.C. § 2306) and would be manifestly unfair to defendant.

▇▇▇ Plaintiff's alternative ground is postulated upon the theory that the various changes, taken cumulatively, constituted a cardinal alteration of the contract and were, therefore, outside the permissible limits of the changes article. This contention may be dealt with briefly. As we said in Saddler v. United States, 287 F.2d 411, 152 Ct.Cl. 557, (1961), there is no exact formula for deciding when a change is unauthorized by the contract and therefore a breach of it. We do not, in any event, think that the changes defendant made here fundamentally altered the nature of the bargain between the parties. While a great proportion of the total length of the steam line was relocated, the line, as built, remained in the same general area and followed the same general route as the one on which plaintiff bid. The changes did not greatly alter the amount of pipe to be installed, nor did they involve different terminals from those called for in the original specifications.

We conclude, therefore, that plaintiff is entitled to recover for six months of delay and we remand the case to the Commissioner for further proceedings to ascertain the amount of damages to be awarded to the plaintiff.

---

10. In computing plaintiff's costs, the Commissioner (presumably through inadvertence) neglected to allow anything for the fair rental value of the equipment plaintiff had at the job-site. We have held that such an allowance, with a 50% discount for the absence of wear and tear, is properly includable in plaintiff's recoverable costs. Warren Bros. Roads Co. v. United States supra; Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40 (1944), cert. denied, 324 U.S. 850, 65 S.Ct. 684, 89 L.Ed. 1410 (1945).