Samuel W. **POORVU** and Beatrice Poorvu

v.

The **UNITED STATES.**

No. 190–66.

United States Court of Claims.

Jan. 23, 1970.

Joseph H. Elcock, Jr., Boston, Mass., attorney of record for plaintiffs. Edward J. McCormack, Jr., and McCormack, Elcock, Cohen & Matera, Boston, Mass., of counsel.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Shiro Kashiwa, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner William E. Day with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on April 29, 1969. Exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law were filed by defendant. Plaintiffs moved that the court adopt the findings of fact and opinion contained in the commissioner's report. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, with minor modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiffs are entitled to recover against the defendant and judgment is entered for plaintiffs in the amount of $381,651.27.

Commissioner Day's opinion, with minor modifications by the court, is as follows:

This is a breach of contract action arising out of an agreement between the plaintiffs' assignors (hereinafter referred to as the Formans or Forman) and the United States of America acting through the Post Office Department (sometimes hereinafter referred to as the POD). The material facts are set forth at length in the findings of fact accompanying this opinion and will be summarized here for consideration of the controlling legal principles.

In May 1956, having decided that a new post office facility was needed in Kansas City, Kansas, the Post Office Department obtained an assignable option to purchase certain land. Shortly thereafter (on July 3, 1956), the POD engaged the services of a Kansas City architect, Joseph W. Radotinsky, to design and supervise the construction of a post office and garage building on that land.

The plan was that ultimately the POD would enter into a long term lease with a private bidder, who would accept transfer to it of the government's option on the land, it would construct the building and its appurtenances in accordance with the plans which the architect had prepared for the government, and that the architect would be retained by the successful bidder to supervise construction of the entire facility.

Initially the POD (through its Architectural Branch, Division of Real Estate, Bureau of Facilities) provided Radotinsky's office with schematic drawings which established the general working area needs of the proposed facility. After receiving an analysis of the subsurface conditions of the proposed site from an independent expert in August 1956, and after preparation of initial diagrammatic plans for the construction of the facility, Radotinsky went to Wash-

ington, D. C., to see James M. Lowe (chief of the above-mentioned Architectural Branch). The topic of their conversation was twofold—the diagrammatic plans, and the subsurface conditions. Lowe agreed that because of the nature of the soil and fill in the land, extensive piling would be needed under the building. However, when told by Radotinsky that piling would also be needed under the extensive maneuvering and parking areas, Lowe chose to reserve his decision on such piling until the preliminary plans and cost estimates were submitted.

After the cost estimates and preliminary plans were completed and submitted, Radotinsky again came to Washington (shortly after Thanksgiving in 1956) to confer with Lowe. The outcome of this conference (over Radotinsky's objection) was that because of the cost involved, piling would be eliminated in the outside parking and maneuvering areas. Thereafter, final plans were drawn by the architect and used in the solicitation of the successful bidder who would assume the option to the land, assume the architectural contract with Radotinsky's firm, construct or have the facility constructed according to the plans and eventually lease the facility to the Post Office Department for an extended term with renewal options. The advertisement for such bids was published by the POD on February 17, 1957.

The bid of Forman to rent the proposed facility to the POD at an annual rate of $159,920 for an initial period of 30 years was accepted on June 21, 1957. The accepted bid specified that maintenance of the leased premises was to be the obligation of the government. However, by an amendment dated June 28, 1957, the parties agreed to 22 changes in the plans in order to reduce the cost of construction and further agreed that maintenance of the premises would be assumed by the lessor. This amendment also reduced the annual rental during the initial rental period from the above-mentioned $159,920 to $157,220.

The construction of the post office was completed, the building was accepted by the government and a lease was executed on August 22, 1958 for the term beginning July 21, 1958 and ending July 20, 1988, with one 10-year and two 5-year renewal option terms.

Paragraph 7 and 10 of that lease are as follows:

7. The Lessor shall, unless herein specified to the contrary keep the demised premises, including the building and any and all equipment, fixtures, and appurtenances, whether severable or non-severable, furnished by the Lessor under the provisions of this lease in good repair and tenantable condition, including but not limited to any necessary servicing contracts, to the satisfaction of the Post Office Department during its occupancy of the premises, except in case of damage arising from the act or the negligence of the Government's agents or employees. For the purposes of so maintaining the premises the Lessor reserves the right at reasonable times to enter and inspect the premises and to make any necessary repairs to the building. The Government shall pay for heat, all utilities, and custodial services.

\* \* \* \* \* \*

10. If any building or any part of it on the leased property becomes unfit for use for the purposes leased, the Lessor shall put the same in a satisfactory condition, as determined by the Postmaster General for the purposes leased. If the Lessor does not do so with reasonable diligence, the Postmaster General in his discretion may cancel the lease. For any period said building or any part thereof is unfit for the purposes leased, the rent shall be abated in proportion to the area determined by the Postmaster General to have been rendered unavailable to the Post Office Department by reason of such condition.

On March 1, 1961, the Formans conveyed the property and assigned the lease

to the plaintiffs herein, Samuel W. and Beatrice H. Poorvu.

On September 8, 1962, on December 2, 1963, and again on August 28, 1964, breaks in the 4-inch water line to the building were discovered and the breaks were repaired. The expenses incurred in the repair of each break were sustained by the Poorvus. Slightly more than a month after the last break, settlement of the building had become so extensive [1] that Poorvu (who resides in Massachusetts) was notified by telephone of the conditions. Poorvu contacted Radotinsky in an effort to ascertain the extent of the damage. Garber-Renne Co. (an engineering consulting firm, hired to assay the nature and extent of the damage) concluded that there had been a general settlement of the ground which extended from the northeast corner of the property to the southwest corner of the building. The maximum settlement (which reached 1.75 feet at one spot) was found in areas in which extensive quantities of ground water were discovered in November 1964. Comparison of the subsurface investigation conducted in November 1964 with that made in 1956, revealed that the ground water found in the later examination was not present at the earlier date.

It was the ultimate conclusion of Radotinsky and the Garber-Renne personnel that the settlement in the maneuvering area over a substantial period of time had exerted a downward pressure on the water pipe which extended into the building from the property line. Since the pipe was supported by hangers as it passed under the building, but was not supported in the maneuvering area, the breaks resulted from the downward pressure in the maneuvering area. All the breaks occurred near the building.

As a result of the breaks, very large quantities of water flowed into the fill under the building. The nature of that fill was such that it easily became saturated with water and consequently lost its capacity to support the piles which supported the building. The obvious end result was the severe settlement and damage caused thereby.

Had the maneuvering area been constructed in the manner originally proposed by Radotinsky (i. e. piles supporting concrete slabs from which the pipes would be suspended), the extensive damage to the building would not have occurred, because the water pipes would not have sheared off.

Efforts to repair the damage caused by the extensive settling and to prevent future settlement, were undertaken and the costs were paid for by Poorvu. A claim for $392,854.84 was presented to the POD, to reimburse plaintiffs for those expenditures, but that claim was denied by the Comptroller General in decision B–136683 (45 Comp.Gen. 617, April 5, 1966) on the ground that the government was not liable for the damage incurred.

In order for plaintiffs to recover in this action, three legal questions must be resolved in their favor. They are: (1) At the time of the construction of the facilities, did the government extend a warranty to the Formans to the effect that if the building was constructed in accordance with the plans furnished by the POD, such building would be fit for its intended purpose, i. e., suitable for rental for at least the initial rental period? (2) If such a warranty was created, may the plaintiffs, as successors in title to the land and assignees of the Formans' lease contract, take advantage of that warranty? (3) Is such an assignment invalidated by the Anti-Assignment Act, 31 U.S.C. § 203?

It is the position of the defendant that the case plaintiffs almost singly rely on to establish a warranty (United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918)) is inapplicable because it applies only to representations made by the government upon which a contractor relies. It is reasoned that since the government made no representations to plaintiffs, no warranty was ex-

---

1. The POD became alarmed and concerned for the safety of its employees.

tended directly to them. And, since the construction aspect of the contract with the Formans under which any warranty would necessarily have arisen, was fully executed when the building and lease were assigned, there could be no assignment of a warranty to the plaintiffs. It is further argued that *Spearin* is inapplicable in this instance because Forman was aware of the subsurface conditions and the architect's recommendations, and that *Spearin* applies only where the contractor must reasonably rely on the plans. Akin to this argument, but outside the purview of *Spearin*, defendant apparently contends that even if a warranty could have been created in these circumstances, plaintiffs are estopped from availing themselves of it because, after award of the bid, but before commencement of construction, Forman became aware of the inadequacies of the plans, but proceeded to employ them in any event. Finally, defendant states that:

> * * * When they [plaintiffs] bought the property in 1961, more than three years after it had been constructed, the damages claimed had not occurred. Therefore, it could be said they purchased, at most, a chose in action against the United States. If that is so, their claim is barred by the Anti-Assignment Act, 31 U.S.C. 203 * *.

For reasons which follow, I am of the opinion that these arguments are without merit and that plaintiffs are entitled to recover.

Plaintiffs have pointed to *Spearin, supra,* Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339, (1963), and Luria Bros. & Co. v. United States, 369 F.2d 701, 177 Ct.Cl. 676 (1966), to fortify their position that when the POD advertised for bidders, accepted the bid of the plaintiffs' predecessor in title and entered into the lease, it warranted the sufficiency of the plans that it supplied. While the facts in this case are not on all fours with any of those cases, and are in fact outside of the normal *Spearin-Laburnum-Luria* context, the underlying principle and reasoning of those cases are clearly applicable to this situation.

In *Spearin, supra,* the plaintiff contracted to build a drydock in accordance with plans and specifications supplied by the government. Part of those plans called for the relocation of a sewer, which plaintiff completed and which was accepted by the government. Subsequently, the sewer burst and plaintiff refused to go ahead with the rebuilding of the sewer and the remainder of the construction unless the government obligated itself to pay for the damage incurred and assumed responsibility for future damage. The government annulled the contract and plaintiff sued for breach of contract. In allowing plaintiff's claim, the Court stated:

> * * * Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. * * * Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil. * * * But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. * * * [Citations omitted].

248 U.S. 132, 136, 39 S.Ct. 59, 61. In both *Laburnum* and *Luria,* actions for breach of contract were sustained, based upon claims that because of faulty plans and specifications supplied by the government, the contractor was extensively delayed and therefore required to incur additional expenses. In *Laburnum,* the court stated:

> * * * In United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), the Supreme Court held that, in a case where the specifications prescribe the character, dimensions and location of the construction work, the Government implicity warrants that the contractor, if he complies with the

specifications, will be able to complete the project within the contemplated period of time. This warranty is akin to the condition implied in every construction contract that neither party will do anything to hinder the performance of the other party. \* \* \* If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover damages for the defendant's breach of its implied warranty. \* \* \* [Citations omitted].

325 F.2d 451, 457, 163 Ct.Cl. 339, 349–350 (1963).

To the same effect is *Luria*, wherein the court stated:

> \* \* \* It is well-settled that when the Government orders a structure to be built, and in so doing prepares the specifications prescribing the character, dimension and location of the construction work, it implicitly warrants that if the specifications are complied with, satisfactory performance will result. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963). When, as here, defective specifications delay completion of the contract, the contractor is entitled to recover damages for defendant's breach of this implied warranty. \* \* \*

369 F.2d 701, 707–708, 177 Ct.Cl. 676, 687 (1966).

■ These cases, therefore, clearly stand for the proposition that when a contractor agrees to construct a facility, for the government as owner, and is required to follow plans and specifications supplied by the government, and those plans are faulty (thereby requiring the contractor to incur additional costs) the government must reimburse the contractor for damage incurred because of the breach of the implied warranty that the plans will be sufficient. The case now before the court is noticeably different in two major aspects: (1) The government did not contract to have the facility built for it as the owner, but as the tenant of the builder-lessor. (2) The damage was not incurred during the construction, but a number of years after the completion of the building. These differences, however, rather than removing the case from the ambit of the *Spearin* rule, if anything, make an even stronger case for the application of the underlying principle and reasoning of *Spearin*.

■ The reasoning of *Spearin* is both simple and straight-forward. If the government chooses to have a building built, it may do so in at least two ways: (1) To explain to potential builders what type of facility it wants and allow the low bidder to design, construct and warrant that the building is fit for its intended purpose, or (2) choose to design the building itself and require the low bidder to construct it in accordance with the plans, and warrant that it will have been constructed in a workmanlike manner. If the plans prove insufficient, it is the government, as the owner, upon whom the defects will take their toll.

■ Instead of contracting to have the post office facility constructed for it as the owner, the POD (apparently in order to relieve itself of the large capital outlay required) contracted to have the low bidder build the post office facility to its specifications and enter into a 30-year lease with three options totaling an additional 20 years. It can be seen that this construction-rental arrangement was different from the normal construction-for-the-owner situation only in the fact that the government devised a method of financing the construction of a facility made especially for it, without sustaining large initial expenditures. This financing arrangement, however, does not alter the government's choices of method of construction. It still has the alternatives of describing to bidders the type of building it wishes to rent and let them build with their own plans, or of requiring construction in accordance with its plans. I can see no reason why a warranty which would arise if the gov-

ernment were the owner should not arise in this situation when it is the designer-lessee. This conclusion becomes more obvious when it is realized that the government could not avoid a lease on a building which was built for it, in accordance with plans supplied by it, on the ground that the building was not sufficient for its needs. In the present situation, as in the situation where it is to be the owner of the facility, the government must answer for damage incurred because of inadequate plans it has furnished.

■ Nor does the fact that in this case the proof of the deficiency in the plans did not manifest itself until after the building was standing for a number of years—unlike the *Spearin-Laburnum-Luria* situation where it becomes known during construction—remove it from the purview of the principles enunciated above. It would make little sense to impose the obligation of an implied warranty and then limit the life of the warranty to the period of construction. It is an implied warranty that the plans, if followed, will result in a properly constructed building; not merely a warranty that the contractor will be able to build a building within a given time period for a certain price.

■ There is also no merit to defendant's closely allied contentions that, since Forman knew of the subsurface conditions and architect's recommendations after he was informed that he was low bidder but before beginning construction, either no *Spearin*-type warranty was created because there was no reliance on the plans and specifications, or that if a warranty was created, plaintiff is estopped from invoking it because Forman went ahead and began construction even though he knew of the architect's misgivings about the plans. The answer to these contentions is simply that the agreement to lease submitted by Forman in answer to defendant's advertisement, and accepted by the government, obligated him to "[c]onstruct a building and improvements on said property in accordance with the Architect's Drawings and Specifications, which are made a part hereof." It is of little avail for the defendant to argue now that a warranty was not created, or that plaintiff should be estopped from enforcing it on the ground that he complied with the contract under which the warranty arose. If conversations took place, as defendant argues, they occurred after the bids were opened and at a time when Forman was already bound to the government. Information made available at that late date is not soon enough to free defendant from its warranty under the *Spearin* doctrine.[2]

■ The argument has also been raised that paragraph 7 of the lease (a covenant that obligates the plaintiff "to * * * keep the demised premises * * * in good repair and tenantable condition * * * except in case of damage arising from the act or the negligence of the Government's agents or employees * * * ") is "an absolute undertaking by the lessor to restore or reconstruct the leased building in the event of structural damage," (45 Comp.Gen. 617, 622) and that this duty was not impaired by the insufficiency of the plans. The essence of this argument is that even if there is an implied warranty that the plans and specifications will be sufficient, when that warranty is weighed against the covenant to repair, the latter must reign supreme. This cannot be accepted. This court has often held that it will not give literal effect to broad exculpatory clauses (assuming for the moment that paragraph 7 is such a clause) if the result is to negate another provision of that contract. See, *e. g.*, Morrison-Knudsen Co. v. United States, 397 F.2d 826, 841,

---

2. There is also considerable question on the record (a) whether the conversations on which the defendant relies took place before the award rather than after, and (b) whether, in any event, these conversations were of a nature which would or should have alerted Forman to the particular defects which later appeared and caused the damage.

184 Ct.Cl. 661, 685–686 (1968); United Contractors v. United States, 368 F.2d 585, 598, 177 Ct.Cl. 151, 165–166 (1966). Therefore, this paragraph 7 must be read to require the lessor to sustain the burden of repairing the premises if those repairs are not necessitated by damage caused by insufficient plans and specifications.

Moreover, it may be further argued that paragraph 7 imposes no duty to repair upon the lessor in this case because of the proviso that he is not responsible for repairs "arising from the act or the negligence of the Government's agents or employees." Since the decision to delete the pilings under the parking and maneuvering area is directly traceable to the POD, it may be concluded that this proviso negates any duty on the lessor to repair in this instance.

Concluding that a warranty was extended by the government when it entered into the contract with Forman does not, however, end plaintiffs' legal hurdles. As indicated above, the question is then presented—whether the plaintiffs, Formans' successors in title and assignees of the lease, may take advantage of that warranty. It is my conclusion that they can do so.

The documents which constitute the obligations undertaken by Forman and the government are the government's advertisement for bids, the agreement to lease submitted by Forman and accepted by the government and the lease. The advertisement requested bids for the lease of a building to be built (in accordance with plans to be supplied by the government) on land on which the government held an option. The advertisement went into substantial detail concerning the provisions of the lease. It specified the term (including renewal option periods), provisions for tax escalation, payments of heat, utilities and custodial services, and that bids be submitted in the alternative—one rental rate if the government assumed the obligation to maintain; a second, if the obligation was assumed by the lessor.

The agreement to lease obligated Forman to accept assignment of the land and purchase it, construct the building in accordance with the plans supplied, and lease the completed building to the government for the specified period at a given rental.

The lease itself, in describing the premises Forman was obligated to rent to the government stated:

\* \* \* \* \* \*

2. The Lessor hereby leases to the Government the following described premises, viz: All that certain parcel of land on the South side of Pacific Avenue \* \* \* together with all structures and improvements thereon, all as shown on building plans, per attached schedule "Main Post Office and Garage", on file in the Post Office Department \* \* \*

The attached schedule, entitled "MAIN POST OFFICE and GARAGE" recited the titles of all of the plans furnished to Forman by the POD in connection with the construction of the facilities.

It is therefore evident that unlike the obligations undertaken by the plaintiff in United Post Offices Corp. v. United States, 79 Ct.Cl. 173 (1934), the contract between Forman and the government was of a dual nature—to build a post office facility in accordance with the government's plans *and* to lease it. This was not a case of two contracts—one to build and one to lease. Such an interpretation is not consonant with the explicit references in the lease, to the plans on file with the Post Office Department.

In other words, when Forman transferred the land to the Poorvus and assigned the lease to them, he actually assigned his *contract* with the government, in which he agreed *inter alia,* to build and lease to the government a building constructed in accordance with the government-furnished plans; and under which the government obligated it-

self, *inter alia,* to furnish plans for a building which, if constructed in accordance therewith, would be sufficient for the intended purposes. Since it is clear that Forman could and did assign his rights in the property and in the lease (both of which grew out of the single contract entered into with the government) it would seem to follow that all other rights (particularly the warranty of the sufficiency of the specifications) which were granted to Forman under that contract were similarly assigned. This conclusion is in harmony with the American Law Institute's Restatement of the Law of Contracts § 151, where it is stated:

### § 151. WHAT RIGHTS CAN BE EFFECTIVELY ASSIGNED.

A right may be the subject of effective assignment unless,

(a) the substitution of a right of the assignee for the right of the assignor would vary materially the duty of the obligor, or increase materially the burden or risk imposed upon him by his contract, or impair materially his chance of obtaining return performance, or

(b) the assignment is forbidden by statute or by the policy of the common law, or

(c) the assignment is prohibited by the contract creating the right.

In Tentative Draft No. 3 (April 18, 1967) of the American Law Institute Restatement of the Law, Second, Contracts, at p. 166, it states:

*Tropic 1. What Can Be Assigned or Delegated*

### § 149. ASSIGNMENT OF A RIGHT

(1) A right is assigned when the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance by virtue of a manifestation of the assignor's intention so to transfer the right.

(2) A contractual right can be assigned unless

(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance or materially reduce its value to him, or

(b) the assignment is forbidden by statute or is otherwise against public policy, or

(c) assignment is validly precluded by contract.

Quite obviously the substitution of the Poorvus for the Formans did not vary materially the government's obligations under the contract, nor increase any risk imposed upon it, nor impair its chance of obtaining the intended return performance. The assignment, which it may be said the government acquiesced in by paying rent to the Poorvus without complaint, merely substituted one party to an impersonal, bilateral contract, for another. There is no reason evident to support the conclusion that the government's responsibility for the sufficiency of its plans is negated by the Forman transfer to the Poorvus, a transfer which did nothing to affect the government's rights under the contract, and correspondingly, which should not affect its liabilities. Indeed, as Judge Madden stated in R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 124 Ct. Cl. 681, 684 (1953):

\* \* \* \* \* \*

We see no justification for throwing upon the plaintiff a loss which is a direct result of faulty specifications promulgated by the Government.

\* \* \* \* \* \*

Finally, defendant presents the question of the effect of the Anti-Assignment Act, 31 U.S.C. § 203, upon plain-

tiffs' claim. The relevant portion of that statute provides:

§ 203. Assignments of claims; set-off against assignee.

All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, except as hereinafter provided, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. * * *

This issue is controlled by Rocky River Co. v. United States, 169 Ct.Cl. 203, 206–207 (1965). In that case plaintiffs (assignees of land that had been leased to the government by their assignors) brought suit in a Congressional reference case to recover damage for diminution of the value of the land caused by the government's failure or inability to remove unexploded bombs from that portion of the land that had been used as an artillery range, as required by the lease. The original lease, as in the present case, ran in favor of the owners, their heirs, successors and assigns. Furthermore, similar to the facts now before the court, the Rocky River Co. purchased the land in 1952 and it was not determined until 1956 that the government could not remove the bombs. The court held therein that:

* * * The cause of action in the case at bar did not accrue until after the property in question was acquired by the assignees. In other words, it was not until after a series of unsuccessful attempts by the government to restore the entire property to its prior condition in 1956 that a breach of the restoration provision occurred. It has been held that the provisions of the anti-assignment statute apply only to claims existing at the time of the transfer. Milliken v. Barrow, 65 F. 888 (C.C.La.1895), affirmed 74 F. 612 (5th Cir. 1896), cert. denied 167 U.S. 746, [17 S.Ct. 991, 42 L.Ed. 1210] (1897). Consequently, plaintiffs are not barred by the anti-assignment statute from prosecuting their claims herein. See also, United States v. Jordan, 186 F.2d 803, 808 (6th Cir. 1951), affirmed by an equally divided court, 342 U.S. 911, [72 S.Ct. 305, 96 L.Ed. 682] (1952).

* * * * * *

█ Likewise, plaintiffs herein are not prevented by the Anti-Assignment Act from proceeding in this court with their claim. See Singer v. United States, 115 F.Supp. 166, 126 Ct.Cl. 417, 424 (1953).

There remains for determination the amount plaintiffs are entitled to recover. Prior to trial plaintiffs submitted to the government a detailed claim for $392,-854.84, and this claim has been audited by the POD. At the trial, an agreement was reached by the parties that if it were determined that the government is liable for the damage incurred, certain of the items presented in plaintiffs' claim are properly recoverable. In fact, this agreement covered the vast majority of the items claimed. As stated in the accompanying findings, the defendant agreed that the $13,601.15 paid to Garber-Renne, engineers; the $27,728.38 paid to Radotinsky-Deardorff & Associates, architects and all but $1,360 of the $299,305.74 paid to Grant Renne & Sons, Inc., contractors, were properly recoverable. Furthermore, it was agreed that if government liability were found, plaintiffs would be entitled to $5,876, rather than the $14,000 claimed, to cover the cost of certain painting that was necessitated by the repairs.

The parties could not agree upon the propriety of certain other expenditures

claimed by the plaintiffs, and it is therefore incumbent upon this court to adjudicate the question of entitlement. Those expenses claimed are as follows:

1. Construction of a fence ........................ $ 1,360.00
2. Airline fares ................................ 3,380.31
3. Hotel and meal expense ...................... 639.61
4. Compensation for travel time ................... 13,200.00
5. Telephone expenses ........................... 380.85
6. Legal expenses ............................... 13,450.00
7. Interest cost incurred on money borrowed in order to repair the building ........................... 7,168.80

Although the testimony clearly indicates that at least part of the $1,360 expenditure for fencing was incurred in the proper rehabilitation of the building, there is no indication as to what percentage is properly allocable thereto and what percentage is allocable to maintenance or improvement. Therefore, the entire claim for $1,360 must be rejected because plaintiffs have failed to demonstrate the amount to which they are entitled.

The claims for airline fares, hotel and meal expenses, compensation for time and telephone and legal expenses are also rejected because there has been no showing that these costs were incurred in the proper rehabilitation of the facility. While it is established that the expenses were incurred, and reasonably inferable that the time was expended, there is no way of knowing that the expenditures were made in connection with the repairs, and not in connection with the prosecution of this claim or other matters extraneous to this litigation.

The claim for reimbursement of the interest costs incurred by the plaintiffs and for interest on the judgment is dismissed because under well-established law, such costs are not the proper subject of a recovery against the United States. United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 590, 67 S.Ct. 398, 91 L.Ed. 521 (1947), Ramsey v. United States, 101 F.Supp. 353, 355–357, 121 Ct.Cl. 426, 431–433 (1951), cert denied 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952).

The final item of damages was not included in the original claim for $392,-854.84 because it involves expenses that had not been incurred as of the date of trial, but which were expected to be incurred by plaintiffs in the concluding stages of the rehabilitation of the building. At trial, Radotinsky testified that it would be necessary to support a water meter pit which exists near the property line, and to support approximately 18 additional feet of pipe which are connected to or adjacent to that pit. The approximate cost of this additional work is $35,000 to $38,000. Accordingly, it is determined that plaintiff is entitled to recover $36,500 in regard to this additional work.

The plaintiffs are entitled to recover the total sum of $381,651.27.

FINDINGS OF FACT

1. On May 22, 1956, the Post Office Department obtained from Willard J. Breidenthal an assignable option to purchase certain lands in Kansas City, Kansas. The purchase price of such lands was to be $50,000.

2. On July 3, 1956, the Post Office Department entered into a contract with Joseph W. Radotinsky (architect of Kansas City) under which he was to perform all professional services in connection with the design and supervision of construction of a post office and garage building to be built on the above site.

3. In the contract, the architect agreed to arrange for and supervise all

topographic surveys, test borings, test pits, soil tests and other subsurface investigations needed in the design of the project. The cost of such surveys, borings and subsurface investigations was included in his fixed fee.

4. The general building requirements for the facility were furnished to the architect. The contract specified that the foundations were to be designed as required by subsoil conditions and that the architect would secure the necessary data in connection therewith.

5. The architect engaged the services of Layne-Western Company, Kansas City, Missouri, to conduct subsurface borings and explorations.

6. The architect obtained a further report on subsurface conditions from the Layne-Western Company (dated August 22, 1956) and sent a copy of it to the Post Office Department on August 23, 1956.

7. The Post Office Department furnished Radotinsky with schematic drawings for the proposed facility. Radotinsky then prepared and submitted diagrammatic plans to the Post Office for approval. He then later furnished preliminary plans for the proposed facility.

8. In early October 1956, the architect called upon representatives of the Post Office Department in Washington, D. C., and conferred with James M. Lowe, who was then the chief of the Architectural Branch, Division of Real Estate, Bureau of Facilities, of the Post Office Department. At that time Lowe was also the chief of the Construction Engineering Branch and the overall administration of design and construction were under his supervision. Radotinsky discussed with Lowe the schematic drawings of the facility and also the matter of the site and subsoil conditions. He told Lowe that in his opinion, the project required that piles be used both under the building and in the parking and truck maneuvering areas. Lowe reserved decision on the use of piles until the architect had prepared and submitted his cost estimate.

9. Shortly after Thanksgiving in 1956, Radotinsky returned to Washington and had another conference with Lowe, at which time they reviewed the preliminary plans and specifications for the facility and reviewed the cost estimate, all of which had been previously prepared and submitted by the architect. The preliminary plans included ones showing piling under the outside parking area and under the outside maneuvering area. The cost estimate also included figures showing the cost of piling under the building and the cost of pile-supported concrete slabs in the parking and maneuvering areas. Lowe stated that the estimate was high and that the piling in the outside areas should be eliminated in order to lower the cost. Radotinsky stated that it would be a mistake to eliminate the piles, structurally, maintenancewise, and every-other-wise.

10. Thereafter, the final plans and specifications were prepared for bid purposes omitting the piling in the parking and maneuvering areas. An unsupported concrete slab was shown in the parking and maneuvering areas. On February 17, 1957, the Post Office Department published an advertisement for bids to "furnish leased space suitable for postal purposes at Kansas City, Kansas, subject to the provisions of the Post Office Department Standard Form of Lease, as modified * * *."

A further condition of the request for bids was that the successful bidder would accept transfer of the government's option to purchase the land, the bidder would construct the building and its appurtenances in accordance with plans prepared by the architect and the bidder would, in effect, take over the contract which the government had entered into with the architect.

11. By letter of June 6, 1957, to Lowe, Radotinsky forwarded 22 proposed changes in the design of the building, which he and Forman had reviewed and discussed, to effect a lower rental cost to the Post Office Department. At this time, Harry N. Forman knew he was

the low bidder and, presumably, expected that his bid would be accepted.

12. Forman's bid was accepted on June 21, 1957, at a rental of $159,920 per annum during the initial 30-year term and with maintenance to be the obligation of the Post Office Department.

13. On June 26, 1957, Forman submitted to the Post Office Department a proposed supplemental agreement. The supplemental agreement was accepted by the government on June 28, 1957. It effected the changes and modifications in the plans as set forth in the list of 22 changes submitted by the architect on June 6, 1957; shifted the obligation of maintenance of the premises from the government to the lessor; reduced the annual rental during the initial 30-year term from $159,920 to $157,220 and increased rentals during the renewal option terms by slightly more than $10,000 per annum.

14. On September 30, 1957, Forman wrote to the Post Office Department and pointed out that there was a considerable discrepancy between the enclosed areas of the building as stated in the advertisement and those specified in the building plans and specifications. Subsequently, it developed that there was a further discrepancy between the advertisement and the plans in the amount of paved area to be provided for this facility.

15. The Post Office Department was sympathetic to the plight of Forman, admitted its responsibility for the mistake in understating the areas in the advertisement and concluded there was a mutual mistake. Accordingly, the matter was referred to the Comptroller General for a decision whether the contract might be reformed to provide additional rental based upon the additional areas to be provided by the lessor. The Comptroller General (in Decision No. B–136683 of August 11, 1958, 38 Comp.Gen. 119) held that Forman was obligated to construct the building in accordance with the drawings and specifications and to lease it according to his agreement and

that there was no basis for reformation of the contract.

16. The building was completed and accepted by the government and a lease was executed on August 22, 1958, for a term beginning July 21, 1958, and ending July 20, 1988, with one 10-year and two 5-year renewal option terms.

17. Paragraph 7 of the lease reads:

7. The Lessor shall, unless herein specified to the contrary keep the demised premises, including the building and any and all equipment, fixtures, and appurtenances, whether severable or non-severable, furnished by the Lessor under the provisions of this lease in good repair and tenantable condition, including but not limited to any necessary servicing contracts, to the satisfaction of the Post Office Department during its occupancy of the premises, except in case of damage arising from the act or the negligence of the Government's agents or employees. For the purposes of so maintaining the premises the Lessor reserves the right at reasonable times to enter and inspect the premises and to make any necessary repairs to the building. The Government shall pay for heat, all utilities, and custodial services.

18. Paragraph 10 of the lease reads:

10. If any building or any part of it on the leased property becomes unfit for use for the purposes leased, the Lessor shall put the same in a satisfactory condition, as determined by the Postmaster General for the purposes leased. If the Lessor does not do so with reasonable diligence, the Postmaster General in his discretion may cancel the lease. For any period said building or any part thereof is unfit for the purposes leased, the rent shall be abated in proportion to the area determined by the Postmaster General to have been rendered unavailable to the Post Office Department by reason of such condition.

19. The Formans conveyed the property to the plaintiffs by deed effective March 1, 1961. Also, the lease was as-

signed to the Poorvus by an assignment effective March 1, 1961, and thereafter the government paid rental to the Poorvus (plaintiffs herein).

20. On September 8, 1962, a break in the waterline to the building was discovered as a result of water seeping through the asphalt pavement near the water meter. Acting upon an emergency repair order and a letter of the owner authorizing emergency repairs, the postmaster contacted Temperature Engineering Corporation, and it made the necessary repairs on that same day. The bill for the repairs and a report on the occurrence were sent to the lessor.

21. A second break was noticed on December 2, 1963 (in the same general area) and Temperature Engineering Corporation again made the necessary repairs. The bill was sent to the lessor with the advice that it was the second time that the 4-inch waterline had broken.

22. A third break was discovered on Friday, August 28, 1964, at about 4:15 p. m., when water was observed trickling into the basement. Temperature Engineering Corporation was notified and recommended that Inter-State Heating and Plumbing Company effect repairs as the former was no longer engaged in that line of work. Inter-State was notified of the situation and (it being late on Friday afternoon) asked the superintending engineer of the Post Office to watch the water pressure in the building very closely, and if the pressure remained constant, necessary repairs would be made on Monday morning, August 31. The general condition and the water pressure were watched closely by the building maintenance crew, and there was only a small amount of water trickling into the basement. The water pressure remained constant until 11:30 p. m. Sunday, August 30, when the pressure dropped. As soon as the drop in pressure occurred, the Board of Public Utilities was notified, and the water supply into the building was cut off. The Inter-State personnel reported early Monday morning, August 31, and located the break under the dock

area, just outside the main foundation. Repairs were effected and water service was restored at 3:30 p. m. on that day. The lessor was advised by memorandum of September 1, 1964. Subsequent settlement of the building became quite extensive and the lessor was advised thereof by telephone on October 2, 1964. At this time, the Post Office officials became alarmed and were concerned for the safety of its employees.

23. On October 2, 1964, Poorvu (the lessor) called Radotinsky, advised him of the settlement of the building and asked that he ascertain the extent of the damage.

24. Various meetings were held by Post Office Department personnel with Poorvu, Radotinsky and the personnel of Garber-Renne (an engineering consultant firm retained by the lessor on the recommendation of Radotinsky). It was concluded that there had been a general settlement of the ground extending from the northeast corner of the property through the southwest corner of the Post Office Department building. The maximum settlement was 1.75 feet at manhole No. 4 near the west property line.

25. The maximum settlement had occurred in areas which were found in November 1964 to contain large quantities of ground water. No water was reported in the test borings made in 1956 and no water was reported in borings outside the area of maximum settlement either in fill or in natural soil.

26. The Garber-Renne firm reported that about 17 million gallons of water had spilled into the ground during the 1964 waterline break. This appears to be a gross error, as the water bill for the month of August 1964 shows about 1,750,000 gallons of water metered to the Post Office (the normal monthly usage was about 400,000 gallons). It appears, therefore, that the balance of 1,350,000 gallons is the amount of water which was deposited in the fill as a result of the last break.

27. The engineering firm found that the gas main, fuel lines and electrical

conduits were badly corroded and subject to failure. Further, it was reported that a toxic gas was being generated within the fill.

28. It was the conclusion of the architect that the fill material in the maneuvering area had settled over a period of time, thus exerting a downward pressure on the water pipe which ran from the building to the edge of the property line. The pipe itself was supported on hangers where it passed under the loading platform, but was not so supported as it passed through the outside maneuvering area. The downward pressure on the pipe in the maneuvering area was resisted by the hangers which held the pipe as it passed under the loading platform. The pressure eventually caused the pipe to break.

29. The water from the broken pipe flowed into the fill material under parts of the building. When such fill material became saturated with water, it lost its bearing friction against the building piles. The bearing capacity of the piles was impaired and, as a result, appreciable settlement of the building took place. Because of the nature of the fill material, some of it was susceptible to taking water and the rest resisted water. Only those piles located in areas saturated by the water were affected by loss of bearing capacity as described above.

30. If a concrete slab supported by piles had been constructed in the maneuvering and parking areas and if the water pipe passing through the area had been supported from such slab by hangers, just as was done on the interior of the building, the pipe would not have broken and the damage would have been avoided.

31. The engineering consultant recommended remedial work which the lessor was requested to perform, and the lessor undertook this work without prejudice to the assertion of his claim of liability against the government.

32. Poorvu completed the work in connection with the repairs to the building and outside areas (including precautionary measures to afford reasonable assurance that there would be no recurrence of the incident) and presented a claim for $392,854.84 to the Post Office Department.

33. In Decision B–136683, April 5, 1966 (45 Comp.Gen. 617) the Comptroller General denied plaintiffs' claim.

34. On June 13, 1966, plaintiffs filed this action to recover the sum of $392,854.84, plus interest and other costs, representing damages incurred in the repairs caused by the settlement in the parking and maneuvering area, the break in the waterline, and the resultant settlement of portions of the main structure.

35. Plaintiffs' claim for $392,854.84 was audited by the Internal Audit Division, Bureau of Chief Postal Inspection, and a report was made to the Chief Postal Inspector on November 2, 1965. The essence of the report is that the claim of the plaintiffs is in accordance with documented expenditures. The report, however, does not purport to pass judgment on the propriety of the expenditures.

36. Plaintiffs' claim was broken down into four categories by the audit report. The categories are based upon the person or organization to whom or by whom expenditures were made. They are:

1. Garber–Renne Company—engineers ............$ 13,601.15
2. Grant Renne & Sons, Inc.—contractors ......... 299,305.74
3. Radotinsky-Deardorff & Associates—architects .. 27,728.38
4. Samuel W. Poorvu—lessor ................... 52,219.57

37. At the trial of this case defendant agreed that if it were determined by this court that liability existed, certain of the aforementioned expenditures

should be recovered. This agreement covered all of the expenses included in the $13,601.15 paid to Garber-Renne Company (engineers), all of the expenses included in the $27,728.38 paid to Radotinsky-Deardorff & Associates (architects), and all but $1,360 of the expenses included in the $299,305.74 paid to Grant Renne & Sons, Inc. (contractors).

Furthermore, it was agreed that the proper amount of painting expense attributable to the rehabilitation is $5,876, rather than $14,000 as included in plaintiffs' claim. Accordingly, the sum of $345,151.27, as computed below (in addition to those items allowed in subsequent findings), is found to be properly recoverable by the plaintiffs.

| | | |
|---|---:|---:|
| Painting | | $ 5,876.00 |
| Garber-Renne Co | | 13,601.15 |
| Radotinsky-Deardorff & Associates | | 27,728.38 |
| Grant Renne & Sons, Inc | $299,305.74 | |
| | 1,360.00 | 297,945.74 |
| | | $345,151.27 |

---

38. The expenditure of $1,360 referred to in finding 37 (to which defendant objected) was for the installation of certain fencing on the Post Office site. It was stated at trial by Radotinsky that some portion of the installation of that fencing was part of the rehabilitation of the Post Office. Although we are convinced that this is true, neither he nor any of the plaintiffs' other witnesses stated what percentage of the expenditure for fencing was related to rehabilitation and what percentage was due to maintenance or improvements. Therefore, it must be concluded that plaintiffs have failed to establish that they are entitled to recover for the installation of the fence.

39. The claim presented by the plaintiffs includes the following sums for costs which were personally incurred by Poorvu:

| | | |
|---|---|---:|
| 1. | Airline fares | $ 3,380.31 |
| 2. | Hotel and meals | 639.61 |
| 3. | Travel time compensation | 13,200.00 |
| 4. | Legal | 13,450.00 |
| 5. | Telephone | 380.85 |
| 6. | Interest | 7,168.80 |

---

At the trial defendant excepted to the allowance of these expenses in the event that it was determined that the government was liable. In regard to the airline fares, hotel, meal, telephone and legal expenditures, which we are convinced were made, and to the claim for compensation of the plaintiff for his time, it must be concluded that although these costs were obviously partially related to the rehabilitation of the building, there is nothing in the record to show what part is attributable thereto and what part might be attributable to the preparation of this claim, or some other condition wholly extraneous to this litigation. Consequently, these parts of the claim must be dismissed for failure of proof of entitlement.

The claim for reimbursement of plaintiffs' interest expense is rejected as contrary to established law.

40. In addition to the claim for $392,-854.84, to reimburse plaintiffs for expenditures made in connection with the

rehabilitation work completed before trial, it was established that additional work would be required, was in the planning stages and would involve a substantial amount of money. Radotinsky testified that about 18 feet of pipe and a meter pit near the property line would also be required to be supported. The estimated cost of this work is $35,000 to $38,000 and it is, therefore, concluded that plaintiffs are entitled to recover $36,500 as the cost of rehabilitating the aforesaid pipe and meter pit.

### CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein the court concludes as a matter of law that plaintiffs are entitled to recover of and from the United States and judgment is therefore entered for plaintiffs in the amount of $381,651.27.