# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-11025

United States Court of Appeals
Fifth Circuit

**FILED**

January 10, 2014

Lyle W. Cayce
Clerk

J. LEONARD SPODEK; ROSALIND SPODEK,

Plaintiffs – Appellants

v.

UNITED STATES POSTAL SERVICE,

Defendant – Appellee.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:07-CV-1888

Before STEWART, Chief Judge, and DeMOSS and CLEMENT, Circuit Judges.

PER CURIAM:*

This dispute arises from the lease of a building in Greenville, Texas. The lessee, the United States Postal Service ("USPS"),[1] vacated the building in 2007 alleging that it was untenantable after asbestos was detected in dust samples taken from various horizontal surfaces in the building. The lessors, J. Leonard Spodek and Rosalind Spodek (the "Spodeks"),[2] sued the USPS for

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] The United States Postal Service is the successor in interest to the Post Office Department, the original lessee.

[2] The Spodeks are the successors in interest to the Penner-Ring Company, the original lessor.

No. 12-11025

breaching the lease, and the USPS brought a breach of contract counterclaim. The district court[3] found that the Spodeks "failed to prove by a preponderance of the evidence that the USPS breached the lease." Furthermore, the district court found "[t]he USPS proved by a preponderance of the evidence that Plaintiffs constructively evicted it from the leased property and defaulted on the lease effective June 30, 2007." For the reasons stated below, we vacate the judgment of the district court and remand for reconsideration in light of this opinion.

## I.     BACKGROUND

In the late 1960s the Post Office Department issued the "Advertisement for Bids to Lease (Construction)," which called for bids for the construction and lease of a postal facility in Greenville, Texas. As part of the bid, bidders were required to provide an "Agreement to Lease," a sample of which was provided in the advertisement for bids. The sample "Agreement to Lease" stated in part:

> 1. The undersigned hereby agree(s), upon acceptance of this agreement by the Government:
>
> > (a) To lease for postal purposes the premises described below from the first day of the month following acceptance by the Government of the completed building and/or any contemplated improvements, additions, repairs or remodeling.
> > . . . .
> >
> > (c) That all other terms and conditions of the basic lease term shall remain the same during the renewal option terms unless stated otherwise herein.
> > . . . .

---

[3] With the consent of the parties, the case was transferred to the magistrate judge "to conduct all further proceedings and the entry of judgment, in accordance with 28 U.S.C. § 636(c)." Because the magistrate judge was acting as a district judge, we will refer to the magistrate court as "the district court."

No. 12-11025

> 2.(a) The property to be leased is located at: . . . A part of Block 184 to the City of Greenville, Texas, . . . and which property will contain areas and spaces, improvements and appurtenances furnished and provided in accordance with Post Office Department Drawing(s) No(s). 10-68-152 dated 10/15/68 (Tentative Drawing for New Leased Postal Facility, Greenville, Texas) including Standard Details and Specifications, and POD Publication 39B dated Jan. 1966 which said drawings are made a part of this agreement by reference thereto.

A host of stipulations by the parties was included in the district court's pretrial order, including the stipulation that "[p]rior to entry into the lease, based on a bidding process with the plaintiffs' predecessor in interest, the building was built according to plans and specifications required by and approved by the Postal Service, including the use of asbestos-containing materials." The lease, which was executed in 1970, is consistent with that stipulation. It states in relevant part:

> It is expressly understood between the parties hereto that the terms and conditions of the Agreement to Lease executed by Penner-Ring Company and accepted by the Government on February 19, 1969, including any amendments or modifications thereto, are made part of this lease and are to be complied with as though fully set forth herein.

Additionally, Paragraphs 7 & 10 of the lease state in relevant part:

> 7. The lessor shall, unless herein specified to the contrary, maintain the demised premises, including the building and any and all equipment, fixtures, and appurtenances, whether severable or non-severable, furnished by the lessor under this lease in good repair and tenantable condition, except in case of damage arising from the act or negligence of the Government's agents or employees.
>
> . . . .
>
> 10. (c) If any building or any part of it on the leased property becomes unfit for use for the purposes leased, the lessor shall put the same in a satisfactory condition, as determined by the Post Office Department, for the purposes leased. If the lessor does not do so with reasonable diligence, the Post Office Department in its

3

No. 12-11025

discretion may cancel the lease. Unfitness for use does not include subsequent unsuitability arising from such matters as design, size or location of the building.

The parties further stipulated:

2.2    The lease provided for a 20-year base term, beginning on July 1, 1970, and ending on June 30, 1990 . . . .

2.3    The lease contained six five-year options, to be exercised by the Postal Service . . . .

2.4    The Postal Service exercised the first four of the six five-year options, thus continuing their tenancy of the building through June 30, 2010.

. . . .

2.8    An inspection of the Greenville Post Office in June 1995 confirmed that some of the building materials used in constructing the building were asbestos-containing materials ("ACM"). Specifically, the inspection confirmed the presence of asbestos in suspended acoustic ceiling tile, floor tile and mastic, baseboard mastic, pressboard flooring, and transit window panels . . . .

. . . .

2.12   In 2000, the United States Public Health Service performed an asbestos and lead inspection at the Greenville post office. It identified several asbestos-containing building materials, although it did not test the plaster covering the cinder block walls. The USPHS identified the asbestos fiber type contained in the ceiling tiles as amosite asbestos, and the remaining asbestos materials as containing chrysotile asbestos.

. . . .

2.31   In October 2006, the Postal Service relocated all of its operations from the Greenville post office to other sites within Greenville, Texas.

. . . .

2.35   On June 21, 2007, the contracting officer, Ms. Rybicki, terminated the lease, effective June 30, 2007, alleging that the leased space was unfit for occupancy, insofar as plaintiffs allegedly had failed to maintain the premises in good repair and tenantable condition, as required by paragraph 7 of the lease . . . .

4

No. 12-11025

## Preliminary Matter

Because the Spodeks initially appealed the USPS's cancelation of the lease administratively, we asked the parties to address whether "the appellants knowingly and voluntarily elect[ed] to proceed under the Contract Disputes Act." The parties agree that the contracting officer misstated the Spodeks' appellate rights in the letter informing them of the lease termination. Thus, we are satisfied that the Spodeks did not knowingly and voluntarily elect to proceed under Contract Disputes Act. *See Essex Electro Eng'rs, Inc. v. United States*, 702 F.2d 998, 1003-04 (Fed. Cir. 1983). Therefore, the Spodeks were permitted to seek relief in federal district court.

## II.     ANALYSIS

### Standard of Review

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Preston Exploration Co., L.P. v. GSF, L.L.C.*, 669 F.3d 518, 522 (5th Cir. 2012) (internal quotation marks and citation omitted).

### A.     Applicable Law and Burdens of Proof

The Spodeks argue that federal common law applies, and although the government did not brief this issue, the authority cited by the government indicates that the government agrees that federal common law is applicable. We will analyze this dispute regarding a government contract under federal common law. *See Forman v. United States*, 767 F.2d 875, 879 (Fed. Cir. 1985).

In *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987), the Federal Circuit stated: "[W]e conclude that the government should bear the burden of proof with respect to the issue of whether termination for default was justified, regardless of the forum and regardless of whose 'claim' is being asserted. Thus, the burden of proof here was on the government on the default issue." Therefore, it is the government's burden to demonstrate that

5

the Spodeks defaulted. "Once the government meets its burden, the burden shifts to the contractor to demonstrate that its nonperformance was excusable." *Lassiter v. United States*, 60 Fed. Cl. 265, 268 (2004) (citing *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996)).

In addition to the general principles cited above, the lease itself contains a provision that addresses liability if the building becomes untenantable. Specifically, Paragraph 7 of the lease requires the lessors to maintain the premises, "except in case of damage arising from the act or negligence of the Government's agents or employees." The parties disagree about which party bears the burden of proof under this provision. It is the Spodeks' contention that the government must prove not only that the building was untenantable, but also that the government did not cause the damage which led to that untenantable condition. The Spodeks fail to cite any authority in support of their position. After reviewing cases addressing similar contractual language, we find that if the lessee proves the building is untenantable, Paragraph 7 of the lease places the burden on the lessor to demonstrate that the damage arose from "the act or negligence of the Government's agents or employees." *See Russell & Assocs.-Fresno Ltd. v. United States*, 1979 WL 16491, at *4, *16-17 & n.14 (Ct. Cl. Mar. 9, 1979); *cf.*, *Spodek v. United States*, 73 Fed. Cl. 1, 10-12 (2006).

## B.   The Asbestos Came From the Building

Although the district court found that "[t]he source of the released asbestos was never determined[,]" our review of the record convinces us that the asbestos came from the building itself.

Tracy K. Bramlett, was retained by the government to serve as an expert in this case. The "Factual Description" portion of his March 9, 2009 report stated in part:

Asbestos containing materials identified in the building consist of the following: 1. Non-friable floor planking; 2. Non-friable caulk; 3. Non-friable transite panels; 4. Non-friable floor tile and mastic; 5. Non-friable cove base mastic adhesive; 6. Non-friable texture over CMU block walls; and 7. Friable ceiling tiles.

. . . .

All of the surface samples collected within the USPS Greenville facility with the exception of five (5) have been determined to contain only Chrysotile asbestos.  The other five (5) samples were determined to contain minor quantities of Amosite with Chrysotile asbestos being the dominate fiber in these samples.

The asbestos survey of the facility indicates that the ceiling tiles which are friable contain Amosite asbestos.  Chrysotile asbestos has been identified in the floor tile, floor tile mastic, caulk, cove base mastic and the texture on the CMU block walls in the structure.  All of these materials are considered non-friable.  Non-friable materials are difficult to get into the air unless they are abraded, sanded, cut, or ground.  The only area in the facility that damaged non-friable materials were identified was on the north end of the processing area where there was exposed cove base mastic which had been disturbed at one time.  In addition, damage was noted to the texture on the CMU block walls.

It was also reported that there have been numerous fires in the surrounding area and that smoke from these fires entered the facility from the return air grills on the south side of the building.  It is possible that the burning structures may have contained asbestos which became airborne and was transmitted into the building via the fresh air makeup system.

From November 27, 1999 to September 25, 2006[,] an asbestos fiber release occurred in the Greenville Post Office.  It is not possible to make a determination of the airborne asbestos levels at the time of the release.  Air sampling was performed at [the] facility in June and October 2006 which did not detect any asbestos structures in the air within the facility.  The Amosite asbestos detected in the wipe samples indicates a minor fiber release from the ceiling tiles.  The Chrysotile asbestos on surfaces indicates that an unknown source either internal or external to the building has caused a fiber release.

There are no industry standards regarding asbestos dust. The dust on the horizontal surfaces would not pose a health hazard to employees unless the material is disturbed and allowed to become airborne. However, the actions, taken by the USPS to evacuate the facility were appropriate and timely based on wipe sample results which indicate an unknown source of Chrysotile asbestos in the building on some horizontal surfaces. A fiber release did occur at the USPS Greenville facility. It is unlikely that USPS employees have been exposed to asbestos from other sources in the building unless materials were disturbed allowing asbestos fibers to be entrained in the air.

Although the report stated that asbestos had been released from an "unknown source either internal or external to the building," the only potential external sources of asbestos identified in the report were fires in the surrounding area which caused smoke to enter the building. But at trial, Mr. Bramlett indicated that there was actually a single fire. Specifically, Mr. Bramlett was asked: "With respect to the possibility that [the asbestos] came from the outside, other than having been told that there was a house fire in the area, did you have any other data that you went by?" Mr. Bramlett responded: "No." Mr. Bramlett's answers to further questions demonstrated that he was not aware of the specific details of that house fire. Furthermore, our own review of the incident report from that house fire and the deposition of the Fire Marshal addressing the same, revealed no evidence that asbestos was released during the house fire or even that the house contained asbestos. We agree with the Spodeks that Mr. Bramlett's suggestion that the asbestos may have come from outside the building was speculative and not supported by the evidence. Additionally, the government has not directed us to evidence in the record that there was another plausible source of asbestos which was external to the building. Therefore, we find that the asbestos came from the building itself.

No. 12-11025

## C.    The Significance of the Building Plans and Specifications

Turning to the asbestos in the building, the district court correctly determined that the issue of whether the building plans and specifications were relevant to the relationship of the parties was a "Threshold Issue" in its analysis.    In addressing this issue, the district court relied on *United Post Offices Corp. v. United States*, 79 Ct. Cl. 173 (1934) ("*UPOC*").

In *UPOC*, the United States Court of Claims considered whether the government or the lessor was responsible for updating the lighting under a lease which required the lessor to provide "satisfactory . . . lighting fixtures." *Id*. at 177. The lessor argued that because the building was constructed with the lighting required by the government's plans and specifications, it was not required to update the lighting after the government rearranged the furniture and additional lighting was needed.  *Id*.  The *UPOC* court found:

> Under existing law the undertaking exacted *two* contracts, the first to be faithfully executed prior to the execution of the second, and it is *under* the second that this cause of action arises.  The defendant's obligation under the first was to enter into a lease of the building after its satisfactory completion.  The first proposal did not fix the terms of the lease to be thereafter agreed upon.
>
> The plaintiff upon the record may not relieve itself of its assumed obligations under a ten-year lease by a contention that the plans and specifications for a building to be leased determine the relationship of landlord and tenant under the separate lease.  The mere fact that the plans and specifications dealt expressly with the same subject matter in some respects is not determinable of the issue.    In the first instance the lighting system was a constructional detail.    In the second place, it was a matter of meeting satisfactorily the necessities of the tenant with respect to lighting during the tenancy.

*Id*. at 178-79 (emphasis in original).  Therefore, even though the building had been built to the government's specifications, the court found that the lessor was responsible for updating the lighting under the lease.  *Id*. at 179-80.

9

No. 12-11025

Relying on *UPOC*, the district court below found, "[a]s a matter of law, the duties of the parties in this case are governed by the terms of the lease, not by the plans and specifications for the building." This was a critical juncture in the district court's analysis because this determination necessarily caused it to disregard the parties stipulation that "the building was built according to plans and specifications required by and approved by the Postal Service, including the use of asbestos-containing materials" and the related stipulations and evidence regarding the plans and specifications.

The Spodeks argue that the district court should have instead applied *Poorvu v. United States*, 190 Ct. Cl. 640, 644-47 (1970), in which the United States Court of Claims addressed who was responsible when a building which was being leased by the government began to settle as a result of insufficient foundation pilings under the maneuvering area. The Court of Claims found that "[t]he documents which constitute the obligations undertaken by [the lessors' predecessors in interest] and the government are the government's advertisement for bids, the agreement to lease submitted by [the lessors' predecessors in interest] and accepted by the government and the lease." *Id.* at 653. The *Poorvu* court distinguished *UPOC* stating:

> It is therefore evident that unlike the obligations undertaken by the plaintiff in [*UPOC*], the contract between [the lessors' predecessors in interest] and the government was of a dual nature—to build a post office facility in accordance with the government's plans and to lease it. This was not a case of two contracts—one to build and one to lease. Such an interpretation is not consonant with the explicit references in the lease, to the plans on file with the Post Office Department.

*Id.* at 654. Based on *United States v. Spearin*, 248 U.S. 132 (1918), and its progeny, the *Poorvu* court found that by providing plans and specifications the government had created an implied warranty that a building "constructed in

10

accordance with [those plans and specifications] . . . would be fit for its intended purpose." 190 Ct. Cl. at 647-652. As the court explained:

> I can see no reason why a warranty which would arise if the government were the owner should not arise in this situation when it is the designerlessee. This conclusion becomes more obvious when it is realized that the government could not avoid a lease on a building which was built for it, in accordance with plans supplied by it, on the ground that the building was not sufficient for its needs. In the present situation, as in the situation where it is to be the owner of the facility, *the government must answer for damage incurred because of inadequate plans it has furnished.*

> Nor does the fact that in this case the proof of the deficiency in the plans did not manifest itself until after the building was standing for a number of years . . . remove it from the purview of the principles enunciated above. It would make little sense to impose the obligation of an implied warranty and then limit the life of the warranty to the period of construction. It is an implied warranty that the plans, if followed, will result in a properly constructed building; not merely a warranty that the contractor will be able to build a building within a given time period for a certain price.

*Id.* at 651 (emphasis added). The *Poorvu* court also rejected the contention that the lessor's obligation to "keep the demised premises . . . in good repair and tenantable condition . . . except in case of damage arising from the act or the negligence of the Government's agents or employees,"[4] *id.* at 652, cut off the government's liability:

> The essence of this argument is that even if there is an implied warranty that the plans and specifications will be sufficient, when that warranty is weighed against the covenant to repair, the latter must reign supreme. This cannot be accepted. This court has often held that it will not give literal effect to broad exculpatory clauses (assuming for the moment that paragraph 7 is such a clause) if the result is to negate another provision of that contract. . . . Therefore, this paragraph 7 must be read to require the lessor to sustain the burden of repairing the premises if those repairs are not

---

[4] This language is nearly identical to the language of the lease in the present case.

necessitated by damage caused by insufficient plans and specifications.

Moreover, it may be further argued that paragraph 7 imposes no duty to repair upon the lessor in this case because of the proviso that he is not responsible for repairs 'arising from the act or the negligence of the Government's agents or employees.' Since the decision to delete the pilings under the parking and maneuvering area is directly traceable to the [government], it may be concluded that this proviso negates any duty on the lessor to repair in this instance.

*Id.* at 652-53 (internal citations omitted). The *Poorvu* court then determined that the government was responsible for the settling of the building. *Id.* at 667.

In the present case, the building was built pursuant to the "Advertisement for Bids to Lease (Construction)," the Agreement to Lease which was accepted by the government ("Executed Agreement to Lease"), and the lease. Although our review of the record did not reveal the Executed Agreement to Lease, the sample Agreement to Lease in the "Advertisement for Bids to Lease (Construction)" specifically incorporated the construction specifications; the parties stipulated that the plans and specifications required "the use of asbestos-containing materials"; Paragraph 19 of the executed lease specifically incorporated the Executed Agreement to Lease; and the parties have not identified any evidence in the record to suggest that the Executed Agreement to Lease did not reference the construction specifications. Therefore, we find that the Executed Agreement to Lease incorporated the government's construction specifications.

Thus, similar to the situation in *Poorvu,* in the present case there was a single agreement because the lease incorporated the Executed Agreement to Lease which in turn incorporated the plans and specifications. Accordingly, the district court below erred in finding that there were two separate agreements. This error was significant because it caused the district court to

disregard the government's construction plans and specifications and the related stipulations and evidence regarding the asbestos containing materials which were required by those plans and specifications. In short, the district court's finding that the plans and specifications were not relevant was central to its conclusions regarding liability. Therefore, we vacate the judgment of the district court and remand for reconsideration consistent with this opinion.

On remand the threshold issue for the district court to consider is the existence and scope of an implied warranty as set forth in *Poorvu*.[5] Importantly, the existence of an implied warranty does not necessarily mean that the government is strictly liable for all of the consequences of the asbestos in the building. For example, if the evidence demonstrates that the Spodeks breached their maintenance responsibility under the lease and that such breach contributed to the release of asbestos which was required by building plans and specifications, the district court may find it appropriate to apportion the damages "in accordance with the liability of each party." *Spodek v. United States*, 73 Fed. Cl. at 26. Because the existence and scope of an implied warranty is a threshold matter, we decline to reach the remaining issues which were briefed by the parties.

## III.  CONCLUSION

The district court erred in finding that the construction plans and specifications were a part of a separate agreement than the lease and irrelevant as a matter of law. Because the plans and specifications were part

---

[5] The district court's opinion contained the following statement: "Plaintiffs failed to prove that asbestos-containing materials were a known contaminant when the plans and specifications for the bidding were acquired and approved by the Department." We are unaware of any authority which supports the view that the government's knowledge of a defect is an element of an implied warranty.

No. 12-11025

of the same agreement as the lease, we vacate the judgment of the district court in its entirety and remand for reconsideration in light of this opinion.

VACATED and REMANDED.