# United States Court of Appeals for the Federal Circuit

---

**27-35 JACKSON AVE LLC,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1122

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00947-DAT, Judge David A. Tapp.

---

Decided: February 4, 2025

---

JEFFREY W. VARCADIPANE, Varcadipane & Pinnisi, P.C., New York, NY, argued for plaintiff-appellant.

STEPHANIE FLEMING, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, ELIZABETH MARIE HOSFORD, PATRICIA M. MCCARTHY.

---

Before LOURIE, BRYSON, and STARK, *Circuit Judges.*

BRYSON, *Circuit Judge.*

The owner of real estate in New York City, 27-35 Jackson Avenue LLC ("Jackson"), appeals from a decision of the United States Court of Federal Claims ("the Claims Court"). That court granted summary judgment to the United States, holding that the government did not breach its lease agreement with Jackson when it terminated the agreement after finding the leased property to be untenantable. We affirm.

## I

## A

In May 2009, the government leased two floors of an office building from Jackson to house the Field Office of the United States Citizenship and Immigration Services ("USCIS") in Queens, New York. App. 2001. The term of the lease was for 15 years beginning after the initial build-out was completed.

The lease contained clauses that permitted early termination under specific conditions. The clause relevant to this appeal is the fire and casualty damage clause, which provided:

> If the entire premises are destroyed by fire or other casualty, this lease will immediately terminate. In case of partial destruction or damage, so as to render the premises untenantable, as determined by the Government, the Government may terminate the lease by giving written notice to the Lessor within 15 calendar days of the fire or other casualty . . . .

App. 2050.

On the morning of January 8, 2015, a Field Office employee discovered extensive water damage throughout the premises caused overnight by a burst sprinkler head. App. 1138. The Field Office was vacated, and operations were ultimately resumed at a different location. App. 1404. On the day after the flood, Daren Marshall, a contracting

officer with the General Services Administration ("GSA"), made a preliminary finding that the flood had rendered the property "no longer tenantable" and sent a letter to Jackson informing it of the government's view. Specifically, Mr. Marshall wrote:

> As you are aware, on January 8, 2015, the entire Premises was flooded. All personal property of the Government within the Premises was damaged or rendered inoperable. Pursuant to Paragraph 17 of the General Clauses of the Lease, the Government has the unilateral right to terminate the Lease if the Premises has been rendered untenantable by fire or other casualty damage . . . . The Government has determined that the entirety of the leased premises is no longer tenantable.

> Please be advised that the Government may elect to terminate this Lease if the Lessor is unable to remediate the space and restore all the tenant improvement to the as built conditions corresponding to the Lease commencement date (the "As-Built Conditions").

> Please provide, by the close of business Monday, January 12, 2015, a remediation plan which outlines the restoration plan to return the space back to tenantable condition . . . . [and] a schedule which shows the timeline in which the Government space will be restored and when we can expect [to] regain occupancy at this location. Please provide this schedule by Monday, January 12, 2015 as well.

> After receiving your plans for remediation and restoration, the Government will review your plan and schedule as the basis for determining if it's in the best interest of the Government to terminate the Lease. Please keep in mind that if we do not receive a response to this notification, then our only choice at that time will be to terminate.

*27-35 Jackson Ave. LLC v. United States*, 16-cv-947 (Fed. Cl.), Dkt. No. 82-1 at 449–50.

At his deposition, Mr. Marshall testified that he made his initial determination that the property was untenantable after examining photographs of the water damage and speaking with employees who had personally viewed the damage. App. 1508–09. He explained that he understood untenantability to mean that "the space would not be able to be used." App. 1520.

On January 10, 2015, an Operations Support Specialist for the government prepared a detailed memorandum noting that approximately one inch of water covered much of the first floor and most of the second floor of the premises. The memorandum estimated that the Field Office would be unusable for months, depending on Jackson's efforts to perform the necessary work to remedy the damage. App. 1356–58. The memorandum included photographs of the ceiling-to-floor wallboard damage and estimates of how much drywall would need to be removed and replaced. App. 1357.

On January 12, 2015, Jackson wrote to advise the government that the first-floor remediation and restoration would be completed by January 21, 2015, and that the second-floor remediation and restoration would be completed by January 30, 2015. App. 2113. Jackson defined remediation to mean that the property would be totally dry with test results certifying the absence of mold conditions. App. 2113. Jackson defined restoration to mean that all damaged floor tiles would be replaced with at least temporary floor tiles until permanent replacement tiles could be approved by the government. App. 2113.

Two days later, GSA informed Jackson that it had determined Jackson's remediation and restoration plan was insufficient. App. 2122. The letter stated that the plan and schedule "does not address how you plan to restore the Government's space to the As-Built conditions at the time of

lease commencement. Please be advised that as-built conditions would include items such as flooring ceiling walls and other items that were completed as part of the initial construction (tenant improvement) of the Government's space." App. 2122.

The following day, Jackson submitted a revised remediation plan and schedule, stating that "it is our best judgment that all remediation will be completed by February 7, 2015," and further explaining the components of the remediation plan. App. 2126. The letter did not address the schedule for the restoration work, nor did it address GSA's request that Jackson state how it planned to restore the premises to "as-built" condition. App. 2125–26.

On January 20, 2015, shortly before the 15-day deadline under the lease for the government to make a determination of untenantability, GSA notified Jackson that, effective immediately, the government was terminating the lease based on its determination that the water damage had rendered the property untenantable and that the property remained untenantable. App. 1123–24.

B

Following the notice of termination, Jackson filed a complaint in the Claims Court. Jackson's complaint, as amended, contained three counts. Only Count III is at issue in this appeal. That count asserted breach of contract and violation of the implied covenant of good faith and fair dealing based on the government's termination of the lease for untenantability. App. 1011–12. The complaint alleged that the government's determination that the property was untenantable due to the water damage was unreasonable and therefore constituted a breach of contract and a violation of the covenant of good faith and fair dealing implicit in the contract. App. 1012. The complaint further alleged that the government's actions following the flooding "provide sound basis for a strong inference that the Government's motivations and intentions were to escape their

contractual obligations on a technicality rather than to co-operate, in good faith, to bring about the express purposes of the Lease, as contemplated by the parties when it was entered into." App. 1012.

After discovery, the parties cross-moved for summary judgment. The Claims Court granted the government's motion. The court rejected Jackson's request to find that the government had applied an erroneous definition of the term "untenantable" when it made its determination of untenantability. The court explained that the plain language of the lease, which provided that untenantability would be "determined by the Government," left the untenantability determination to the discretion of GSA, as long as that discretion was exercised in good faith. App. 7. The court further explained that the disagreement between the parties as to whether the property was untenantable was merely an honest difference in judgment. Accordingly, the court held that the government's determination of untenantability was conclusive and did not result in a breach of contract. App. 7–9.

Turning to the question whether the government had violated the duty of good faith and fair dealing, the court explained that such a violation must be established by clear and convincing evidence because Jackson's claim involved allegations of bad faith. App. 10–14. Applying that standard, the court held that the evidence offered by Jackson, even when viewed in the light most favorable to Jackson, could not support the conclusion that the government exercised its discretion to determine untenantability in bad faith. App. 10–14.

## II

### A

Jackson contends that the Claims Court erroneously construed the clause allowing the government to terminate the lease if the premises were rendered "untenantable, as

determined by the Government."  In determining whether the premises have been rendered untenantable, Jackson argues that the government was required to apply the common law meaning of "untenantable" in landlord-tenant law.  If the government had done so, Jackson contends, it could not have determined that the USCIS offices were untenantable.[1]

The problem with Jackson's argument is that it effectively reads the words "as determined by the Government" out of the contract.  Jackson's interpretation of that clause accords no deference to the government's determination and treats the clause as if it permitted termination of the lease only if the premises were found (presumably by a court) to be untenantable.

We reject Jackson's interpretation.  Instead, we agree with the Claims Court that the disputed clause should be interpreted according to its plain meaning, i.e., that the government was given the authority to determine whether the property was untenantable.  That is particularly so because the lease does not define "untenantable," nor does it

---

[1]    Jackson argues (Br. 18) that the term "untenantable" has a well-established meaning in landlord-tenant law, referring to "such significant destruction that the space is not only temporarily unoccupiable, but that it cannot be restored using ordinary repairs in a reasonable period of time, with particular regard to the amount of time and cost of the repairs compared to the remaining time and value of the lease."  That characterization is not so much a definition of "untenantable" as a list of some of the factors a decisionmaker may consider when determining whether premises have been rendered untenantable.  While some courts confronted with issues of untenantability have applied some or even all of these factors, other courts have not.  Thus, we do not agree with Jackson that "untenantable" has a singular meaning.

provide a framework or standard for evaluating untenantability.

Our construction of the "untenantable" clause in the contract is consistent with the construction given to an identical clause on very similar facts by the Court of Claims. In *Brown v. United States*, No. 13-79, 1981 WL 30810 (Ct. Cl. Nov. 17, 1981), the court adopted the opinion of the trial judge in the case, who construed the language "untenantable, as determined by the Government," to mean that the government "cannot be held liable for exercising, in good faith, the discretion it was given under [the contract] to terminate the lease." *Id.* at *3 n.3.[2]

Even earlier, the Supreme Court addressed a similar contract clause, which provided that for the payment of transportation costs for contractors delivering goods between certain points, the distance between those points would be "ascertained and fixed by the chief quartermaster of the district of New Mexico." *Kihlberg v. United States*, 97 U.S. 398, 400 (1878). The Court found that language "to be susceptible of no other interpretation than that the action of the chief quartermaster, in the matter of distances, was intended to be conclusive." *Id.* at 401. The Court added that "in the absence of fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment, his action is conclusive," *id.* at 402, and that his action "cannot be subjected to the revisory power of the courts without doing violence to the plain words of the contract," *id.* at 401.

---

[2]    Jackson correctly notes that the referenced portion of the Court of Claims' decision in *Brown* was dictum and thus is not binding on us. The court's analysis of that issue, however, is set forth in some detail, and even though it is not part of the court's holding, it is entitled to respect.

To be sure, the government's discretion is not without limits. When the government is given the power to render final decisions on questions of fact, its decision will be set aside if the decision is arbitrary, capricious, or unreasonable. *Knotts v. United States*, 128 Ct. Cl. 489, 491 (1954). More specifically, in a case in which a contract gives the government unilateral authority to make a decision affecting its contracting partner, the Supreme Court has held that the government's "judgment should be exercised not capriciously or fraudulently, but reasonably, and with due regard to the rights of both the contracting parties." *Ripley v. United States*, 223 U.S. 695, 701–02 (1912). That principle is consistent with decisions from this court and our predecessor court recognizing the well-established rule that "[a] party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *Pac. Far E. Line, Inc. v. United States*, 394 F.2d 990, 998 (Ct. Cl. 1968); *see also Scott Timber Co. v. United States*, 333 F.3d 1358, 1368 (Fed. Cir. 2003); *Am. Export Isbrandtsen Lines, Inc. v. United States*, 499 F.2d 552, 576 (Ct. Cl. 1974); *Fox Valley Eng'g Inc. v. United States*, 151 Ct. Cl. 228, 236–37 (1960) (A clause vesting in the contracting officer the right to reject work for "any deficiencies which in the opinion of the contracting officer would adversely affect the reproduction quality" of the work must "necessarily be given wide scope. Nevertheless, it is equally elementary that the discretion involved must be exercised reasonably and fairly.").[3]

---

[3]    By analogy, government contracts often contain a clause allowing the government to terminate the contract if the contracting officer "determines that a termination is in the Government's interest." *See* 48 C.F.R. § 52.249-2. This court and its predecessor have held that "[i]n the absence of bad faith or clear abuse of discretion, the contracting officer's election to terminate for the government's

The case law on which Jackson relies does not persuade us otherwise. Jackson cites *W.G. Cornell Co. of Washington D.C., Inc. v. United States*, 376 F.2d 299 (Ct. Cl. 1967). In that case, the Court of Claims acknowledged that the government had the "undisputed right" to decide whether particular material met the standards set forth in the contract specifications, but that it had to exercise its discretion "reasonably and fairly." *Id.* at 313. Based on the facts before it, the court found that the government's interpretation of the specifications was "arbitrary and capricious" and the failure to grant the contractor an equitable adjustment was "grossly erroneous." *Id.* We apply the same framework as the *Cornell* court in that we consider whether the government's exercise of its discretion was unreasonable or arbitrary and capricious.[4]

---

convenience is conclusive." *T & M Distributors, Inc. v. United States*, 185 F.3d 1279, 1283 (Fed. Cir. 1999); *see also Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed. Cir. 1995); *John Reiner & Co v. United States,* 325 F.2d 438, 442 (Ct. Cl. 1963).

[4]    Jackson also relies on *W. R. Lathom Tool & Machine Co. v. Mutual Leasing Associates, Inc.*, 435 N.E.2d 510 (Ill. App. Ct. 1982), for the proposition that the government was required to apply the common law meaning of "untenantable." *Lathom* is not binding authority, but in any event *Lathom* is consistent with our analysis. In *Lathom*, the contract provided that "fair market value" for a particular product would be determined by Lathom. *Id.* at 511. Adopting the same rule we apply in this case, the court there held that Lathom had the discretion to determine the value of the product so long as that value was not arbitrarily chosen or unrelated to the actual market value of the product. *Id.* at 512–13. Applying that principle, the *Lathom* court found that the party's value determination

This framework does not render the term "untenantable" in the contract irrelevant. Nor does it mean the government may define untenantability unilaterally or without regard to the meaning of that term in landlord-tenant law. To the contrary, the ordinary definition of the term "untenantable" provides context for our evaluation of whether the government's determination of untenantability was unreasonable or arbitrary and capricious. *See Cnty. of Suffolk v. United States*, 26 Cl. Ct. 924, 927–28 (1992).

In the case of leases that do not contain detailed provisions regarding a lessee's right to terminate the lease for untenantability, courts have typically focused on the extent of the damage and whether the premises can be restored without unreasonable interruption of the tenant's occupancy. *See Flores v. Allstate Tex. Lloyd's Co.*, 229 F. Supp. 2d 697, 700 (S.D. Tex. 2002); *Marcel Hair Goods Corp. v. Nat'l Savings & Trust Co.*, 410 A.2d 1, 6 (D.C. Ct. App. 1979); *Presbyterian Distribution Serv. v. Chicago Nat'l Bank*, 171 N.E.2d 86, 90 (Ill. App. Ct. 1960); *Luis v. Ada Lodge #3, Independent Order of Odd Fellows*, 294 P.2d 1095, 1098–99 (Idaho 1956).

Because the extent of the damage affects the lessee's rights principally through its effect on the lessee's ability to resume full enjoyment of the premises, the key question is typically whether the tenant will lose the use of the leased property for an unreasonable period of time. *See* Restatement (Second) of Prop.: Landlord and Tenant § 5.4 &

---

(of $1 for a product that, at minimum could be sold for scrap) was arbitrary. Nothing about the court's ruling on those extreme facts supports a conclusion that the government's determination of untenantability in this case was unreasonable or arbitrary and capricious.

cmt. f (1977). That inquiry turns on factors such as the nature of the lessee's use of the property and the extent to which the loss of occupancy disrupts the tenant's business. *See* 1 Andrew R. Berman, Friedman on Leases § 9.5, at 9-41 to 9-45 (6th ed. 2017). By their nature, those factors often give rise to disputes between the parties. Parties can minimize such disputes by bargaining to give one party the right to determine whether the casualty in question has rendered the property untenantable.

If the contract in this case had simply stated that the government could terminate the lease if the premises were untenantable, the determination of whether the property was untenantable would be for the court. Instead, the contract left the untenantability decision to the government in the first instance. The court's role was therefore limited by the terms of the contract to determining whether the government's decision was the product of an unreasonable assessment of whether the premises were untenantable.[5] The contract also permits the court to assess the government's understanding of the meaning of "untenantable"

---

[5] Although state court cases in which lessees have the contractual right to determine whether damaged premises are untenantable are rare, one such case is *Amick v. Metropolitan Mortgage & Securities Co.*, 453 P.2d 412 (Alaska 1969). The court in that case reached a conclusion similar to ours, although it articulated the test somewhat differently. The court held that a clause stating that "the lessee's decision shall be controlling" as to whether or not the premises are fit for occupancy did not "give the lessee the right to abate the rent by deciding without more that the premises were unfit for occupancy," but that the clause made the lessee's decision controlling "where there is room for an honest difference of opinion between the lessor and the lessee as to whether the premises are fit for occupancy by the lessee." *Id.* at 414.

and whether it applied a definition so removed from the ordinary meaning as to constitute arbitrary, capricious, or unreasonable action.

With that interpretation of the relevant provision in mind, we turn to Jackson's arguments for why the government's determination should be set aside.

## B

The undisputed facts of this case support the Claims Court's conclusion, on summary judgment, that no reasonable factfinder could find that the government's determination of untenantability was unreasonable or arbitrary and capricious. For example, the Operations Support Specialist who examined the premises after the flood found that much of the leased space was covered by approximately an inch of water, that there was ceiling-to-floor damage, that more than 1,500 square feet of drywall would have to be removed and replaced, and that the property would be unusable for months. App. 1355–58. Jackson's remediation plan involved water extraction; moving furniture, business machines, and files; removing damaged material, including insulation, carpet, drywall, and ceiling tiles; placing drying equipment on the premises; disinfecting all areas of the building; using air scrubbers to remediate air quality; and cleaning the HVAC system and ducts. App. 2125. Even under Jackson's proposed schedule, that work was expected to take at least a month from the date of the accident.[6] App. 2126.

---

[6]    It is undisputed that Jackson revised its estimate for when remediation would be complete and identified February 7 as the expected completion date, after initially suggesting earlier dates (*e.g.*, January 13 for the first floor and January 16 for the second floor).

Beyond that, Jackson's letter identifying February 7 as the expected date for completing remediation still failed to provide an estimate of when restoration would be complete. Therefore, at the time the government was required to exercise its right to terminate the lease (which was only 15 days after the flood), it was unknown when USCIS could return to the leased premises.

We are also unpersuaded that the timing of the government's determination of untenantability shows that the government's decision to terminate the lease was unreasonable. The government sent Jackson a letter on January 9, 2015 (one day after the accident), in which it stated that it had determined that the property was untenantable, but it did not seek to terminate the lease at that time, and thus it was clear that the government's January 9, 2015, assessment of untenantability was only tentative. Instead, the government waited until January 20, 2015—12 days after the accident—to make its final untenantability determination.

During those 12 days, the Operations Support Specialist evaluated the damage, App. 1355–58, and GSA considered Jackson's proposed remediation and restoration plan, App. 2122. Jackson argues that the government acted with undue haste in making its termination decision only 12 days after the accident. Yet by the terms of the lease the government was required to make its determination of untenantability within 15 days of the accident. App. 2050. The government therefore did not have the luxury of waiting to see whether the remediation and restoration work would be completed quickly. Had the government waited four more days than it did to make its final untenantability decision, it would have lost its right to terminate the lease no matter how long the restoration process took. Given the short window provided by the lease and the investigative steps that the government took during that period, the government's decision to terminate the lease when it did cannot be deemed unreasonable.

An important consideration bearing on the reasonableness of the government's action is the nature of the business conducted at the office in question. The USCIS Field Office was responsible for distributing information regarding immigration, reviewing applications, adjusting status, and naturalizing approved immigrants. As part of its mission the office received up to 750 visitors per day. In considering the needs of the office, the extent of the damage, the nature of the restoration efforts that would be required, and the uncertainty as to when the restoration work would be completed, it was not arbitrary and capricious for the government to determine that the property was untenantable.[7] App. 2345.[8]

---

[7] Because of the need to continue its work to the extent possible, the USCIS had to move all its operations to a location in downtown Manhattan. App. 1404. Jackson suggests (Br. 38) that the fact that USCIS was able to find another location at which to continue its work is an indication that the damaged premises should not have been declared untenantable. That argument is unpersuasive. The work was important and had to continue, so the government was going to have to find a place to continue the work, even if relocation of its operations was burdensome and expensive. The fact that the government was able to find a substitute workplace does not suggest that the flooded offices were tenantable.

[8] If there had been a transient condition that briefly required the premises to be abandoned—such as, for example, a malfunctioning fire alarm that required the premises to be vacated for an hour, or even for a day—the government's contractual right to "determine untenantability" would not extend to such an interruption because such a brief interruption could not reasonably be deemed to render the property untenantable. At his deposition, Mr.

Jackson argues that the Claims Court erred by not imposing on the government the burden of proving that the property was untenantable. Under that theory, only if the government satisfied that initial burden would Jackson be required to show that the government's decision was arbitrary and capricious.

For that argument, Jackson relies on the unpublished Fifth Circuit decision in *Spodek v. United States Postal Service*, 551 F. App'x 781 (5th Cir. 2014). Besides not being a binding precedent, *Spodek* did not involve a clause that allocated to the lessee the right to determine whether the property was untenantable, as determined by the lessee. For that reason, the decision in that case turned on whether the property was in fact untenantable. *Id.* at 785. It is therefore not surprising that the court in *Spodek* assigned the burden of proving untenantability to the party seeking to invoke the untenantability clause and terminate the lease. In this case, by contrast, the question is not whether the property was in fact untenantable, but whether the government abused its discretion in determining the property to be untenantable. In that context, it would make no sense to allocate the burden of proof on untenantability to the government. Instead, the burden was properly placed on Jackson to show that the government abused the authority that was delegated to it under the contract.

In sum, we agree with the Claims Court's analysis. It was undisputed that (1) a large portion of the Field Office was unfit for the purpose for which it was leased, (2) the government had to cease daily operations in the premises due to the water damage, and (3) it was clear that the

---

Marshall agreed with that proposition, stating that he would not regard a property as being untenantable if it were unusable for "a couple of hours or a day," or a week. App. 1523.

premises would be under remediation and restoration for at least a month, and probably longer. Moreover, by the terms of the lease, the government was required to make an untenantability determination within 15 days of the day of the flood. As a result, the government necessarily had to make its determination of untenantability without knowing all the facts that would bear on untenantability, such as how long the restoration process would take once remediation was complete.

For these reasons, we agree with the Claims Court that no reasonable factfinder could find the government's determination of untenantability to be unreasonable or arbitrary and capricious. App. 8–9. We conclude that the dispute between the government and Jackson over whether the property was untenantable amounts to a difference in judgment and is not a reason to set aside the government's determination, given the language of the lease agreement that left the determination of untenantability to the government. App. 7.

C

Jackson's second argument for overturning the summary judgment decision is that the Claims Court erred in applying the clear and convincing evidentiary standard when evaluating Jackson's claim that the government breached the implied covenant of good faith and fair dealing that attaches to all contracts. In making that argument, Jackson denies that it is asserting a bad faith claim. We find Jackson's attempt to distinguish its claim from a claim of bad faith to be unconvincing.

Jackson argues in its opening brief that the government expressed animus toward Jackson, that a reasonable factfinder could conclude that following the water damage the government planned to cancel the lease regardless of whether the property was actually untenantable, and that the government through its agents conspired to manufacture circumstances to support the termination. Based on

this characterization, it is clear that Jackson is alleging bad faith by the government. *See, e.g.*, *Rd. & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1370 (Fed. Cir. 2012) (considering evidence of improper motive when evaluating bad faith claim); *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (considering evidence of conspiracy "to get rid of plaintiff" and animus toward plaintiff when evaluating a bad faith claim).

Even if Jackson were correct that its claim is not based on allegations of bad faith, it must establish at least the absence of good faith, because "there can be no relief from an erroneous judgment exercised in good faith pursuant to valid discretion power." *Pac. Far E. Line*, 394 F.2d at 998. Therefore, Jackson must rebut the presumption that "government officials are presumed to discharge their duties in good faith." *Rd. & Highway Builders*, 702 F.3d at 1368. In view of that presumption, Jackson needed to prove a lack of good faith by clear and convincing evidence. *See id.* at 1369; *see also Am-Pro Protective Agency*, 281 F.3d at 1240. Accordingly, we find that the Claims Court applied the correct standard of clear and convincing evidence to Jackson's claim.

Applying that standard, we agree with the Claims Court that a reasonable factfinder could not find that the government's decision to terminate the lease because of the water damage was pretextual. As the Claims Court explained, Jackson did marshal some evidence that the USCIS employees were dissatisfied with the property and Jackson's management. App. 11. But the decision to terminate was made by GSA officers, not by the dissatisfied USCIS employees. *Id.* Furthermore, although Jackson presented evidence that the dissatisfied employees urged GSA officers to terminate the lease, the evidence showed that the GSA officers exercised independent judgment when doing so. App. 12. In short, Jackson's evidence was insufficient for a reasonable factfinder to find, by clear and

convincing evidence, that the government acted in bad faith when determining untenantability.[9] That conclusion is further supported by our finding above that the government's determination was not unreasonable or arbitrary and capricious in view of the extent of the damage, the extent of the restoration that would be required to return the office to its pre-flood condition, and the immediate need for a facility that could support the Field Office's busy daily operations serving as many as 750 daily visitors.

## III

We have considered Jackson's remaining arguments and find them unpersuasive. For the reasons stated, we affirm the Claims Court's summary judgment decision.

## **AFFIRMED**

---

[9]   Jackson argues (Br. 51) that under "the correct legal standard" it raised "questions of fact regarding Jackson's fair dealing claim." Because we hold that the "clear and convincing evidence" standard applies to Jackson's fair dealing claim, and because we conclude that the evidence proffered by Jackson failed to create a triable question of fact under that standard, we uphold the Claims Court's summary judgment ruling on that issue.